**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHI ALFRED ZUH, a/k/a Chi A. Zuh,

*Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney General,

*Respondent.*

No. 06-2050

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 25, 2008

Decided: November 25, 2008

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Vacated and remanded by published opinion. Judge Motz wrote the opinion, in which Judge King and Judge Duncan joined.

## COUNSEL

**ARGUED**: Sarah M. Brackney, ARNOLD & PORTER, L.L.P., Washington, D.C., for Petitioner. Thomas Henderson Dupree, Jr., UNITED STATES DEPARTMENT OF JUS-TICE, Washington, D.C., for Respondent. **ON BRIEF:** Rod

J. Rosenstein, United States Attorney, Alex S. Gordon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Respondent.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

An Immigration Judge (IJ) found Chi Alfred Zuh eligible for asylum and granted him withholding of removal and protection under Article 3 of the United Nations Convention Against Torture. Despite Zuh's eligibility, the IJ denied asylum as a matter of discretion. The Board of Immigration Appeals (BIA) affirmed without opinion. Zuh petitions for review of this final order. Finding that the IJ failed to consider the totality of the circumstances in denying Zuh asylum, we vacate and remand for further proceedings consistent with this opinion.

I.

Zuh, a native of Cameroon, came to this country in 2001 and soon thereafter sought asylum. He claims to have been subject to severe torture and beatings in Cameroon due to his political activities in two opposition parties, the Social Democratic Front (SDF) and the Southern Cameroon National Council (SCNC).

Specifically, Zuh testified that the Cameroonian government arrested and tortured him on four separate occasions: in February 1995, in January 1997, in May 1997, and finally in September 2001. On all four occasions, Zuh was stripped naked, severely beaten, confined for extended periods in inhumane quarters, and given little food, water, or medicine. He had to be hospitalized after being released and suffered per-

manent injuries, which he documented through medical certif-
icates from a Cameroonian doctor and a letter from an
American doctor.

Fearing for his life after the fourth imprisonment, Zuh
escaped from prison and immediately thereafter, with the help
of his uncle, borrowed a French passport. He then flew to the
United States and took up residence with his uncle's friend,
Peter Clarkson Fon. Zuh belongs to the American chapters of
both the SDF and the SCNC. He believes that the Cameroo-
nian government will arrest, torture, and possibly kill him if
the United States returns him to Cameroon.[1]

At Zuh's first hearing, the IJ denied him all relief. The IJ
found Zuh's supporting documentation to be of limited proba-
tive value and faulted him for presenting insufficient corrobo-
rating evidence, such as other witnesses or letters from family
members in Cameroon. As a result, the IJ found that although
Zuh carried his burden of proof as to general conditions in
Cameroon, he did not present sufficient evidence of danger
specific to himself. Significantly, however, the IJ did not fault
Zuh's veracity or find him incredible.

On appeal, the BIA remanded the case to the IJ in light of
new evidence Zuh presented to the Board. At the second hear-
ing before the IJ, Zuh testified that at the first hearing he had
been reluctant to involve his family for fear of endangering
them. But, in what he described as an agonizing decision, he
decided to provide new documentary evidence from his fam-

---

[1]Zuh is not the only member of his family to suffer oppression. He testi-
fied that the Cameroonian government also subjected his brother to politi-
cal persecution, imprisoning him in 1997; Zuh has not heard from his
brother since that date. In addition, in the course of their efforts to find
Zuh after his departure from Cameroon, government security forces have
harassed and beaten his parents, fiancée, and children. The government
has also threatened to kidnap Zuh's children. And because his uncle
helped Zuh escape Cameroon, the Cameroonian government harassed and
then imprisoned the uncle.

ily. Two witnesses also testified on Zuh's behalf: a friend of his fiancée's, Henrietta Bettah, and the man with whom he lives in the United States, Peter Clarkson Fon.

After the conclusion of the second hearing, the IJ granted Zuh withholding of removal and protection under the Convention Against Torture. The IJ reasoned that Zuh—ostensibly through the testimony of his two witnesses—had shown a "clear probability that someone in [Zuh's] position . . . would face the prospect of torture." But "in the exercise of [her] discretion" the IJ denied Zuh asylum because of Zuh's assertedly "incredible documentation" and "not completely truthful" testimony. In reaching this conclusion, the IJ entered what she characterized as a "split credibility finding," stating that although Zuh's witnesses were credible, he was not. She also based this "split credibility finding" on her conclusion that Zuh's documents had "little or no probative value" either because they did not constitute affidavits or because they contained alleged irregularities.

The BIA, through a single member, affirmed without opinion. Zuh then filed this petition for review.

II.

A.

We have jurisdiction over final orders of removal under 8 U.S.C. § 1252(a)(1) (2006). When the BIA summarily affirms the IJ's decision, we review the correctness of the BIA's final order but review the reasoning of the IJ's opinion, "recognizing that the Board has concluded that any error in reasoning is 'harmless or nonmaterial.'" *Camara v. Ashcroft*, 378 F.3d 361, 366 (4th Cir. 2004) (*quoting* 8 C.F.R. § 1003.1(e)(4)).

We review an IJ's discretionary denial of asylum for abuse of discretion. *Dankam v. Gonzales*, 495 F.3d 113, 119 n.2 (4th Cir. 2007). Although this standard of review is deferential, it

does not offer an IJ a blank check. *See Huang v. INS*, 436 F.3d 89, 97 (2d Cir. 2006) (noting that the courts and the BIA have established "extensive limitations on an IJ's exercise of discretion in the context of asylum-eligible refugees"). Rather, an IJ must weigh all relevant evidence under the totality of the circumstances. *Dankam*, 495 F.3d at 119 n.2; *Kalubi v. Ashcroft*, 364 F.3d 1134, 1139 (9th Cir. 2004); *Shahandeh-Pey v. INS*, 831 F.2d 1384, 1387 (7th Cir. 1987). Moreover, as we have long recognized, an IJ must "'offer a specific, cogent reason for [his or her] disbelief'" of the applicant, *Figeroa v. INS*, 886 F.2d 76, 78 (4th Cir. 1989) (*quoting Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir. 1987)), and we will not defer to adverse credibility findings based on "'speculation, conjecture, or an otherwise unsupported personal opinion.'" *Tewabe v. Gonzales*, 446 F.3d 533, 538 (4th Cir. 2006) (*quoting Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir. 2003) (en banc)).

## B.

Zuh applied for three different protections: asylum under 8 U.S.C. § 1158(b) (2006), withholding of removal under 8 U.S.C. § 1231(b)(3) (2006), and protection under Article 3 of the United Nations Convention Against Torture (CAT). The IJ, the BIA, and the Government do *not* contend that Zuh failed to meet the standards for the last two—withholding of removal and CAT protection—both of which entail a greater burden of proof than the first—asylum eligibility.[2] Nor do

---

[2]The preponderance of the evidence standard applies to withholding of removal. *INS v. Stevic*, 467 U.S. 407, 429–30 (1984). The applicable burden of proof for protection under Article 3 of the Convention Against Torture is similar, requiring a showing that it is "more likely than not that [the applicant] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (2008). In contrast, asylum eligibility involves a lower burden of proof. The applicant need only prove that he is "unable or unwilling to return" to his country of nationality or the country in which he last habitually resided "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42) (2006); *Anim v. Mukasey*, 535 F.3d 243, 252 (4th Cir. 2008).

they contend that any statutory factors bar Zuh from asylum. *See* 8 U.S.C. § 1158(b)(2) (2006). Thus, indisputably Zuh has established asylum eligibility. The question before us is whether the IJ appropriately exercised her discretion in denying Zuh this relief.

An asylum applicant who meets the legal standard for asylum is only "*eligible* for asylum," which the Attorney General (or his or her designee) "in his [or her] discretion" may grant. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 443 (1987). Although discretionary denials of asylum do occur, such denials are "exceedingly rare," *Huang*, 436 F.3d at 92, and are generally based on egregious conduct by the applicant. *See, e.g.*, *Aioub v. Mukasey*, 540 F.3d 609, 612 (7th Cir. 2008) (applicant's fraudulent marriage); *Kouljinski v. Keisler*, 505 F.3d 534, 543 (6th Cir. 2007) (applicant's three drunk-driving convictions).

A discretionary denial of asylum is even more rare when the IJ or BIA has found the applicant entitled to withholding of removal or protection under the CAT. Although applicable regulations permit an IJ to grant withholding of removal while denying discretionary asylum, *see* 8 C.F.R. § 208.16 (2008), the Board has affirmed such a disposition in very few cases and only when the Government has demonstrated egregious negative activity by the applicant. *See, e.g.*, *Matter of Shirdel*, 19 I. & N. Dec. 33, 37–38 (B.I.A. 1984) (applicant circumvented orderly refugee procedures by using a smuggler to gain entry into the United States). Furthermore, we know of only one (unpublished) Court of Appeals decision upholding such a disposition. *Aden v. Ashcroft*, 112 F. App'x 852, 854 (3d Cir. 2004) (applicant repeatedly failed to disclose his prior grant of asylum in a third country). On the other hand, two other Courts of Appeals, addressing similar situations, have soundly rejected this course. *See Huang*, 436 F.3d at 97–102; *Kalubi*, 364 F.3d at 1138–39. Indeed, the Attorney General himself acknowledges in a motion filed in this court that the IJ's holding in this case is "internally inconsistent."

We agree with the Second Circuit that this sort of resolution places an applicant in an "unusual legal status," in which he is ineligible to become a lawful permanent resident here, unable to reunite his family as derivative asylees, and subject to deportation to a willing third country. *Huang*, 436 F.3d at 95. We bear this in mind as we turn to the rationale offered by the IJ in this case.

## III.

Based on her "split credibility finding," the IJ exercised her discretion to deny Zuh asylum. Zuh contends that no substantial evidence supports this finding. He notes that at his first hearing, the IJ did not enter an adverse credibility determination and that at his second hearing the IJ refused to allow him to testify at length, stating that she did not want to cover "old ground." Thus, he contends that although the IJ did not make an adverse credibility finding at the first hearing, her subsequent "split credibility finding" effectively invalidated the bulk of his testimony from that first hearing.

## A.

The IJ appears to rest her determination that Zuh was not "particularly credible" on what she characterized as an inconsistency between his testimony at the first and second hearings. This asserted inconsistency concerned the failure of the person with whom Zuh lives in the United States, Peter Clarkson Fon, to testify at Zuh's first hearing.

A straightforward reading of the record reveals there simply is no inconsistency. The IJ suggested that at the first hearing Zuh represented that Clarkson was unwilling to testify, whereas at the second hearing Clarkson not only testified but also stated that he would have testified at the first hearing if asked. But the record reveals that at the first hearing Zuh apparently thought that an affidavit from Clarkson (a busy cab driver) would suffice, while at the second hearing, given the

IJ's initial dismissal of his claim, Zuh concluded that he needed Clarkson's testimony to bolster his case. In short, Zuh *never* asserted that Clarkson had been unwilling to testify at the first hearing.

Even if this did constitute an inconsistency, it provides a thin reed on which to rest the conclusion that Zuh does not constitute a "particularly credible witness."[3] We have previously faulted an IJ for "attach[ing] the bare label 'implausible' to [a petitioner's] testimony without providing specific and cogent reasons for doing so." *Tewabe*, 446 F.3d at 539. Given that Zuh's testimony was "not inherently implausible," we likewise find "unsustainable" this IJ's "unexplained characterization" of Zuh. *Id.*

## B.

The IJ dismissed letters from Zuh's family because they lacked sworn affidavits, even though Zuh authenticated the letters through his testimony and the Government never objected to the lack of affidavits.

We recognize that sworn affidavits may often deserve greater weight than simple letters. But no statute or case law suggests that documents at immigration hearings must be sworn. Rather, without so much as pausing to note the unsworn nature of a document, numerous courts—including this one—have relied on such documents when considering claims of asylum applicants. *See, e.g.*, *Tewabe*, 446 F.3d at 537; *Camara*, 378 F.3d at 369; *Shahandeh-Pey*, 831 F.2d at 1386; *In re Casillas*, 22 I. & N. Dec. 154, 157 n.3 (B.I.A. 1998) (noting that an applicant can demonstrate marriage through "letters or affidavits from family, friends, or acquaint-

---

[3]We note that the IJ did preface her discussion of this "inconsistency" with the phrase "[f]or example," implying that additional factors contributed to her credibility finding. But we can only evaluate a credibility determination on the grounds actually articulated.

ances"). Moreover, it seems untenable to require a sworn statement from a person harassed because of a relationship with an asylum applicant and potentially endangered by helping that applicant in a country with conditions that the IJ herself described as "deplorable." *See Hor v. Gonzales*, 421 F.3d 497, 501 (7th Cir. 2005) ("It seems unlikely that Hor's co-workers, who surely have a healthy respect for the murderous potential of [a radical Islamic group in Algeria], would submit affidavits to the U.S. immigration authorities.").

The unsworn nature of the many documents relied on by Zuh thus provides no basis for the IJ's refusal to credit them.

## C.

The IJ also found fault with two aspects of medical certificates submitted by Zuh to corroborate the injuries he suffered from torture.

First, the IJ found it significant that the handwriting on a letter from Zuh's Cameroonian doctor does not seem to match the handwriting on the text of medical certificates that the doctor prepared. We note, however, that in addition to the letter, the doctor submitted an affidavit certifying the authenticity of both medical certificates, and the signature and seal on the affidavit match the signature and seal on both certificates. Thus, whatever the differences between the two sets of documents, clearly the Cameroonian doctor signed and affixed his seal attesting to the accuracy of both the affidavit and the certificates. Zuh also testified to the authenticity of the certificates, and no witness contradicted either the doctor's affidavit or Zuh's testimony. For these reasons the IJ's apparent reliance on the handwriting in the letters does not seem well founded.

The IJ also found it implausible that the medical certificates, although assertedly prepared months apart, contain serial numbers separated by only four digits. The Government

did not comment on this issue until its closing argument at the first hearing, when it suggested that "perhaps more than just four certificates would've been issued during that period of time." The IJ dismissed out of hand Zuh's response that Cameroonians rarely request these "medico-legal" certificates because they are expensive and because most injury claims in Cameroon are settled.

Zuh has consistently maintained this explanation throughout his testimony at both hearings and it certainly is not inherently implausible. *See Tewabe*, 446 F.3d at 539. Moreover, his Cameroonian doctor offered the same explanation. As the Seventh Circuit has noted, "The notion that documentation is as regular, multicopied, and ubiquitous in disordered nations as in the United States, a notion that crops up frequently in decisions by immigration judges, is unrealistic concerning conditions actually prevailing in the Third World." *Hor*, 421 F.3d at 501 (citations omitted).

For these reasons, the IJ's brief analysis of these serial numbers seems to us mere speculation or conjecture. *Tewabe*, 446 F.3d at 538.

### D.

Finally, the IJ found a newspaper article discussing Zuh and his uncle incredible because it contained non-consecutive page numbers and was set forth on seemingly mismatched paper. Like the medical certificate issue, the Government lawyer did not raise this contention until closing argument (this time at the second hearing), when he asserted that it was "interesting" that the page numbers were not consecutive and that "I'm not an expert, but it does appear as though the paper used for that insert is slightly different than the paper on the rest of the newspaper."

Essentially, the IJ, adopting the Government's contention, concluded that Zuh fabricated the newspaper article out of

whole cloth, complete with consistent page headers, adver-
tisements, pictures, and other articles. Once again, we ques-
tion the appropriateness of speculating about foreign
documents, *see Ayi v. Gonzales*, 460 F.3d 876, 883 (7th Cir.
2006), and holding a Cameroonian dissident newspaper to the
same standard as the *New York Times* or even the *Baltimore
Sun*.

### E.

Having exhausted our analysis of the possible reasons for
the IJ's negative credibility finding, the standard of review
requires us also to consider the cumulative effect of those rea-
sons. *See, e.g.*, *Dankam*, 495 F.3d at 122–23. In this case each
of the IJ's stated problems gains no stature when considered
in combination with the others. We thus have serious misgiv-
ings with the IJ's "split credibility finding." Nevertheless, we
will assume, without deciding, that substantial evidence sup-
ported this credibility determination because we conclude
below that the IJ did not—as she must—consider the totality
of the circumstances in exercising her discretion.

### IV.

### A.

Zuh's central contention is that the IJ abused her discretion
in denying him asylum given the record in this case and the
IJ's findings as to his eligibility for withholding of removal
and protection under the CAT.

To date we have not outlined the relevant factors to be con-
sidered when determining whether to grant or deny discretion-
ary asylum relief. Relevant regulations, decisions of other
courts, and administrative opinions, however, provide sub-
stantial assistance in this regard. *See, e.g.*, 8 C.F.R.
§ 208.14(a) (2008) (general provision granting IJs discretion-
ary power to grant or deny asylum); *id.* § 208.16(e) (mandat-

ing reconsideration of a discretionary denial of asylum where the applicant will be separated from his spouse and minor children by virtue of a grant only of withholding of removal); *Shahandeh-Pey*, 831 F.2d at 1387–88; *In re H-*, 21 I. & N. Dec. 337, 347–48 (B.I.A. 1996); *Matter of Burbano*, 20 I. & N. Dec. 872, 874–79 (B.I.A. 1994); *Matter of Chen*, 20 I. & N. Dec. 16, 18–22 (B.I.A. 1989); *Matter of Pula*, 19 I. & N. Dec. 467, 472–75 (B.I.A. 1987); *Matter of Marin*, 16 I. & N. Dec. 581, 584–87 (B.I.A. 1978).

In light of these authorities, we believe that courts and IJs should consider, when relevant, the following non-exhaustive list of factors as part of the totality of the circumstances. *See Dankam*, 495 F.3d at 119 n.2. On the positive side, an IJ should consider:

1)  Family, business, community, and employment ties to the United States, and length of residence and property ownership in this country;

2)  Evidence of hardship to the alien and his family if deported to any country, or if denied asylum such that the alien cannot be reunited with family members (as derivative asylees) in this country;

3)  Evidence of good character, value, or service to the community, including proof of genuine rehabilitation if a criminal record is present;

4)  General humanitarian reasons, such as age or health;

5)  Evidence of severe past persecution and/or well-founded fear of future persecution, including consideration of other relief granted or denied the applicant (e.g., withholding of removal or CAT protection).

On the negative side, relevant factors include the:

1) Nature and underlying circumstances of the exclusion ground;

2) Presence of significant violations of immigration laws;[4]

3) Presence of a criminal record and the nature, recency, and seriousness of that record, including evidence of recidivism;

4) Lack of candor with immigration officials, including an actual adverse credibility finding by the IJ;

5) Other evidence that indicates bad character or undesirability for permanent residence in the United States.

We emphasize that an IJ need not analyze or even list every factor. *See Casalena v. INS*, 984 F.2d 105, 107 (4th Cir. 1993). To the contrary, we explicitly reject such an "inflexible test" and recognize the "undesirability and 'difficulty, if not impossibility, of defining any standard in discretionary matters of this character.'" *Marin*, 16 I. & N. Dec. at 584 (*quoting Matter of L-*, 3 I. & N. Dec. 767, 770 (B.I.A. 1949)). But at the very least, an IJ must demonstrate that he or she reviewed

---

[4]Some elaboration is necessary concerning the presence of immigration law violations. Although this factor "is a proper and relevant discretionary factor," the BIA has cautioned against affording it too much weight. *Pula*, 19 I. & N. Dec. at 473 (noting that overly weighting this factor would have the "practical effect [of] deny[ing] relief in virtually all cases"). Instead, this factor itself involves a totality of the circumstances inquiry, such that the IJ must examine the "actions of an alien in his flight from the country where he fears persecution." *Id.* When an alien uses fraudulent documents to escape imminent capture or further persecution, courts and IJs may give this factor little to no weight.

the record and balanced the *relevant* factors and must discuss the positive or adverse factors that support his or her decision. *Casalena*, 984 F.2d at 107; *Marin*, 16 I. & N. Dec. at 585 ("The basis for the immigration judge's decision must be enunciated in his opinion.").

## B.

In the case at hand, the IJ offered only the following explanation as the basis for her decision to deny asylum:

> The application for asylum is denied in the exercise of discretion because under the Board's decision in *Matter of O-D-*, the Court finds that the respondent is responsible for some of the incredible documentation that he has provided. The Court holds him also accountable for testimony, which the Court believes was not completely truthful.

The IJ thus stated that she based her decision to deny asylum solely on Zuh's testimony and "incredible" documentation without discussing the wealth of other corroborating evidence he presented. This, at the very least, suggests that she did not consider all relevant factors. *See Huang*, 436 F.3d at 99.

Besides the IJ's dubious "split credibility finding," we can find only one factor—never mentioned by the IJ –- that lends any support to her decision to deny asylum: Zuh entered the United States on a borrowed passport. But the record makes it clear that Zuh obtained this passport immediately after escaping from detention and torture in Cameroon and so reasonably believed the passport necessary to escape further imminent persecution.

Not a single other factor appears to support the IJ's conclusion. Zuh has no criminal record and has never participated in torture or persecution. Furthermore, after entering this country, Zuh obtained a work permit, attended tractor-trailer train-

ing school, and befriended someone who testified to his good character. The IJ apparently failed to consider these factors or that Zuh has a fiancée and two young children still in Cameroon, who continue to be harassed by the government. Because withholding of removal, unlike asylum, does not allow the applicant to bring his family to this country, *Huang*, 436 F.3d at 100–01, the IJ should certainly have considered this factor.

Perhaps most troubling, the IJ does not appear to have factored evidence of either Zuh's past persecution or his well-founded fear of future persecution into her determination to deny him asylum relief. This factor "outweigh[s] all but the most egregious adverse factors . . . [and] [t]he actual experience of past persecution should also weigh in favor of a grant of asylum." *Huang*, 436 F.3d at 98 (citations and emphasis omitted); *see also Dankam*, 495 F.3d at 119 n.2 (*quoting Huang*, 436 F.3d at 98); *Shahandeh-Pey*, 831 F.2d at 1388 (noting that it was "[r]emarkabl[e]" that the IJ failed to weigh the applicant's well-founded fear of persecution).[5]

Indisputably, Zuh has advanced consistent, credible evidence in support of his contention that he has suffered severe persecution and faces a danger of persecution if returned. First, as even the IJ acknowledged, Zuh provided an avalanche of country condition documentation, which convinced

---

[5]At oral argument, the Government asserted that an IJ need only weigh an applicant's well-founded fear of persecution when the IJ has denied all other types of relief. This argument seems premised on the notion that because the grant of withholding of removal prevents the Government from returning the applicant to his native country, it renders the danger of persecution in that country irrelevant. Certainly, an IJ must give an applicant's fear of persecution greater weight when she denies the applicant all other relief. *See Pula*, 19 I. & N. Dec. at 474. But we reject the categorical approach urged by the Government. As the Second Circuit noted, "if one accepted this position, those very asylum-seekers who met the higher standard of proof of persecution required for withholding of removal (and thus those persons most in need of this nation's asylum relief) would be the ones who received less protection." *Huang*, 436 F.3d at 98 n.11.

the IJ that "the human rights situation in . . . Cameroon today is deplorable."

Second, Zuh provided various details about his arrests that remained remarkably consistent throughout both hearings. Not only did Zuh's direct testimony accord with his own cross-examination and with his father's letter, but also— although unmentioned by the IJ—a letter from an American doctor corroborated Zuh's description of the injuries torture caused him. Indeed, this doctor expressly stated, "I thus conclude that Chi Alfred Zuh did suffer the torture and abuse that he claims."

Third, although in her first decision the IJ faulted Zuh for not having letters from his family corroborating his testimony, she apparently failed to consider that at the second hearing Zuh presented three letters from his fiancée and letters from his father, his sister, his mother, his uncle, and one of his uncle's employees. Moreover, Zuh's explanation for not offering this evidence at the first hearing—that he feared endangering his family—seems entirely plausible.

Finally, we must note a particular tension in the IJ's opinion. Her adverse credibility finding rested on her disbelief of Zuh and his documents. But she found Zuh's witnesses, Bettah and Clarkson, credible and explicitly rested Zuh's eligibility for withholding of removal and CAT protection on their testimony. An honest reading of the record renders this conclusion untenable given that the testimony of these two witnesses provides little more than ancillary detail.[6] Therefore, in

---

[6]The testimony of Bettah and Clarkson, standing alone, does not appear sufficient to meet the burden of proof for withholding of removal. Bettah, who herself has been granted asylum, testified only that she rode in a car with Zuh for ten minutes on the way to an SDF meeting, thus verifying his membership in the SDF and corroborating a very minor part of his testimony. Clarkson testified only about the circumstances of Zuh's arrival in the United States and about a trip to Cameroon during which he verified that the Cameroonian government continues to harass Zuh's family.

granting withholding of removal and CAT protection, the IJ must have relied on the very documents and testimony she found incredible in denying discretionary asylum.

An IJ cannot have it both ways, finding an applicant and his documents incredible for one purpose and yet relying on them for another. *Kalubi*, 364 F.3d at 1138–39 ("[I]f an applicant's testimony on a particular issue is not found incredible for purposes of determining whether he is eligible for asylum, it must be taken as true—and cannot be found incredible—on the same issue for purposes of determining whether he is entitled to asylum."). This sort of judicial sleight of hand constitutes the very definition of an abuse of discretion.

For all of these reasons, we cannot uphold the IJ's decision based on the stated rationale. We recognize, however, that our role is *not* to weigh the evidence and "determine which of the competing views is more compelling." *Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999). Accordingly, we must remand the case so that an IJ may consider the totality of the relevant evidence in determining whether Zuh merits discretionary asylum relief.

## V.

Before concluding, we note that academic literature and court decisions have grown increasingly strident in their criticism of the immigration review process. Our finding today adds to this rising tide of criticism.

Academic literature critical of the current state of immigration law abounds. Perhaps the most prominent is a recent empirical study that criticizes immigration judges, the BIA, and the federal courts for failing to adjudicate asylum cases consistently. Jaya Ramji-Nogales et al., *Refugee Roulette: Disparities in Asylum Adjudication*, 60 Stan. L. Rev. 295 (2007). But this is by no means the only academic commentary to take issue with the administration of immigration law

and to emphasize the importance of appropriate judicial review. *See, e.g.*, Eric M. Fink, *Liars and Terrorists and Judges, Oh My: Moral Panic and the Symbolic Politics of Appellate Review in Asylum Cases*, 83 Notre Dame L. Rev. 2019 (2008).

At a broad level of generality, we note that the Supreme Court has emphasized the importance of judicial review in the immigration context. *See INS v. St. Cyr*, 533 U.S. 289, 298–99 (2001). Moreover, courts have grown increasingly skeptical of the high error rate within the immigration system. In a remarkable opinion, Judge Posner recently noted that the Seventh Circuit had "reversed the Board of Immigration Appeals in whole or part in a staggering 40 percent of the 136 petitions to review . . . on the merits" over the prior year. *Ben-slimane v. Gonzales*, 430 F.3d 828, 829 (7th Cir. 2005). He concluded that "the adjudication of [immigration] cases at the administrative level has fallen below the minimum standards of legal justice." *Id.* at 830. Similar judicial criticism of immigration adjudications appears in a variety of other contexts. *See, e.g.*, *Wang v. Att'y Gen.*, 423 F.3d 260, 269 (3d Cir. 2005) ("The tone, the tenor, the disparagement, and the sarcasm of the IJ seem more appropriate to a court television show than a federal court proceeding."); *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1054 (9th Cir. 2005) ("[T]he IJ's assessment of [p]etitioner's credibility was skewed by pre-judgment, personal speculation, bias, and conjecture . . . ."); Adam Liptak, *Courts Criticize Judges' Handling of Asylum Cases*, N.Y. Times, Dec. 26, 2005, at A1.

This circuit, too, has criticized immigration judges' decisions. *See, e.g.*, *Dankam*, 495 F.3d at 124–25 (Shedd, J., concurring) (questioning portions of the IJ's credibility determination); *Tewabe*, 446 F.3d at 540 (faulting the IJ for giving "no cogent explanation based on common sense, the record, or any other relevant factor for disbelieving [the petitioner]"); *Camara*, 378 F.3d at 370, 372 (criticizing the IJ for

"completely ignor[ing]" independent evidence and for "fail-[ing] to follow the [agency]'s own regulations").

We note, however, that like most issues, the weight of opinion does not fall entirely on one side. For example, Judge Kozinski has excoriated his colleagues for "a systemic effort to dismantle the reasons immigration judges give for their decisions." *Abovian v. INS*, 257 F.3d 971, 980 (9th Cir. 2001) (Kozinski, J., dissenting from denial of rehearing en banc); *see also Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 169 (3d Cir. 2005) (Smith, J., dissenting) ("In my view, the majority's approach is effectively one of *de novo* review. The law forbids us from substituting our judgment for that of the BIA . . . ."); Stephen H. Legomsky, *Learning To Live with Unequal Justice: Asylum and the Limits to Consistency*, 60 Stan. L. Rev. 413 (2007). Therefore, at this juncture we are not prepared to join Judge Posner or others in their wholesale critique of IJs.

But we must perform our statutory duty. Although the legislature has constricted our review of immigration decisions like this one, it certainly has not eliminated our role. Rather, Congress has established a multi-layered system for adjudication of immigrant claims. *See, e.g.*, 8 U.S.C. §§ 1158, 1229a, 1252 (2006); 8 C.F.R. §§ 1003.1, 1003.10 (2008). The administration of that system lies in the first instance with hard-working immigration judges and the Board of Immigration Appeals, but the Courts of Appeals ensure that the system works properly. We do so not by substituting our judgment for that of the IJs, but rather by ensuring adherence to law, proper support of findings in the record, and the considered and proper exercise of discretion.

For these reasons, we grant the petition for review, vacate the BIA's order affirming the IJ's decision, and remand the case for further consideration consistent with this opinion. In addition, we urge the BIA to "recommend that the Chief

Immigration Judge schedule this case on remand before a different IJ." *Camara*, 378 F.3d at 372.[7]

*VACATED AND REMANDED*

---

[7]We note Zuh's argument that the BIA erred in not assigning his appeal to a three-member panel. *See* 8 C.F.R. § 1003.1(e)(4) (2008). Although we agree that this case warranted review by such a panel, our disposition moots this point.