**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-1436**

AHMED SHAH MAJID; SIMA A. MAJID;  S. M.,

Petitioners,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

**No. 08-1489**

AHMED SHAH MAJID; SIMA A. MAJID;  S. M.,

Petitioners,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

On Petitions for Review of Orders of the Board of Immigration Appeals.

Argued:  May 15, 2009              Decided:  July 14, 2009

Before MICHAEL, SHEDD, and AGEE, Circuit Judges.

Petitions for review denied by unpublished per curiam opinion.

**ARGUED:** David Christopher Drake, JOHNSON & ASSOCIATES, PC, Arlington, Virginia, for Petitioners. Paul F. Stone, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Randall L. Johnson, JOHNSON & ASSOCIATES, PC, Arlington, Virginia, for Petitioners. Gregory G. Katsas, Assistant Attorney General, Civil Division, Ethan B. Kanter, Senior Litigation Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ahmed Shah Majid seeks review of the Board of Immigration Appeals' (BIA) affirmance of an immigration judge's (IJ) denial of his application for asylum and withholding of removal. Majid additionally seeks review of the BIA's denial of his motion for reconsideration. Majid claims that the IJ and the BIA erred in ruling that his asylum application was not timely filed. He also claims that the IJ erred in finding that he was not credible and that he had not established a likelihood of future persecution if he was returned to Afghanistan. We deny Majid's petition for review as to both of these claims. First, this court lacks jurisdiction to consider Majid's challenge to the timeliness of his asylum application. Second, we conclude that the IJ offered, on balance, cogent reasons to support his adverse credibility determination -- a determination that formed a sufficient basis for the IJ and the BIA to deny Majid's request for withholding of removal.

I.

Majid is a native and citizen of Afghanistan seeking asylum in the United States or, alternatively, withholding of removal to Afghanistan, on behalf of himself and his wife and daughter. Majid claims to have traveled from Afghanistan to the United States with his wife and daughter in August of 2001. The

3

date of his family's entry into this country, however, was not conclusively established. According to Majid's asylum application, his testimony before the IJ, and several affidavits, he entered the United States by boat on August 10, 2001. An additional affidavit from Majid's cousin places his arrival on August 10, 2002, four months <u>after</u> Majid had filed his asylum application within the United States. Neither the IJ nor the BIA credited Majid's account of his travel to the United States, and the IJ placed Majid's arrival in the United States "on or about August 10, 1999," J.A. 177, thereby disqualifying Majid's asylum application, which he was required to file within one year of his entry into the United States.

Majid sought to establish the following facts in support of his asylum application and application for withholding of removal. While residing in Afghanistan, Majid suffered persecution first at the hands of a powerful general, Rashid Dostum, and later from the Taliban after it came to power in 1996. Majid was trained as a lawyer and studied English for approximately four years in school in Afghanistan. He came to General Dostum's attention in 1989 while defending a man accused of bribery and corruption who claimed to have been framed by the general. Majid investigated the case and concluded that General Dostum had indeed framed his client because the client had previously accused the general and the general's soldiers of

4

gang raping the man's daughter. When General Dostum learned of Majid's investigation, he had his soldiers threaten Majid and order Majid to discontinue the investigation. Majid refused to do so. Majid was eventually arrested by General Dostum with the help of the KHAD (the Afghani security and intelligence agency). While in prison Majid was tortured, and after his release under a general amnesty thirteen months later in 1991, he remained "under the watch of General Dostum's soldiers who were always harassing [him]." J.A. 1060. Following his release Majid wrote "secretive newsletters condemning the human rights atrocities committed by the communists." Id. When General Dostum and the mujahidin came to power in April 1992, Majid spoke out against them before fleeing from Kabul to Kara-Bagh, where he remained for six years.

Majid was forced to return to Kabul in 1998 when the Taliban began burning villages in the north of Afghanistan. Upon his return to the capital, Majid suffered abuse at the hands of the Taliban. He was beaten once for not wearing his beard at an appropriate length, and was arrested twice in 2000 and held for a month and then for three weeks based solely on his Tajik ethnicity and the fact that he was from north of Kabul, the region where the Northern Alliance had fought against the Taliban. In Kabul Majid spoke out against the Taliban's rejection of cooperation with the United Nations and aid from

5

the United States. Majid was accordingly accused of helping Christians and Westerners. In 2001 Majid, upon learning from a friend that the Taliban was planning to execute him, arranged his family's flight from Afghanistan.

Majid paid the equivalent of $25,000 to two smugglers, Najeeb and Asef, to help his family to get to the United States. The smugglers provided Majid and his wife and daughter with false documentation in the form of green passports. Beginning in Pakistan, Asef accompanied the Majid family throughout their travels to the United States. The journey involved crossing the border into Pakistan on foot, driving several hours, taking three plane flights, the first from Pakistan to an Arab country that Majid was unable to identify, the second to a European country that Majid was also unable to identify, and the third to a country that Majid later concluded was Canada, based on its proximity to New York. The family then embarked on a boat for the final leg of their journey and ultimately arrived in New York. There, Majid contacted a relative in Virginia, and Asef bought train tickets to Virginia for Majid and his wife and daughter. Asef accompanied Majid and his family on the first few stops of their rail journey, but Asef then got off the train, taking with him the group's tickets, which had been punched by the conductor. The only documentation from the journey Majid retained is a handwritten receipt in English from

6

the Shobra Hotel in Peshawar, Pakistan, where Majid and his family stayed for two nights on the 26th and 27th of July 2001.

On April 1, 2002, Majid filed an application for asylum with the Department of Homeland Security (DHS). After conducting a credible fear interview, DHS referred Majid to the Department of Justice for removal proceedings and charged Majid with removability under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Majid appeared before an IJ and conceded removability, but sought relief from removal in the form of asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The IJ denied Majid's asylum claim, holding that Majid failed to demonstrate by clear and convincing evidence that he had filed the claim within one year of his arrival in the United States. Further, the IJ found that Majid was not a credible witness. The IJ therefore determined that Majid had not established that he suffered persecution in Afghanistan on account of a protected criterion, and concluded that Majid failed to establish that it was more likely than not he would be persecuted if he returned to Afghanistan. The IJ consequently rejected Majid's applications for withholding of removal under the INA and the CAT. He also found Majid ineligible for voluntary departure pursuant to INA § 240B(b), 8 U.S.C. § 1229c(b), because Majid had not established a desire for voluntary departure, the means

7

to do so, or that he had been present in the United States for more than one year before the notice to appear was served.

On appeal the BIA affirmed the IJ's decision. It adopted the IJ's finding that Majid failed to establish entrance into the United States within one year of filing his asylum application and the IJ's adverse credibility determination. The BIA accepted the reasons offered by the IJ and, in addition, pointed out the contradiction between Majid's cousin's affidavit, which places the date of Majid's entry into the United States on August 10, 2002, and the other affidavits, Majid's application, and Majid's testimony, which place it on August 10, 2001. The BIA noted that this contradiction "significantly underscores the propriety of the Immigration Judge's decision on this issue." J.A. 60. The BIA also rejected Majid's claim for withholding of removal under the CAT. Majid filed two subsequent motions for reconsideration with the BIA, both of which were rejected, and he now petitions for review of the denial of his asylum application and the denial of withholding of removal.

II.

Majid first challenges the IJ's and the BIA's determinations that he did not timely file his asylum application within one year of his arrival in the United States.

8

Majid does not dispute that pursuant to INA § 208(a)(2)(B), 8 U.S.C. § 1158(a)(2)(B), he bore the burden of proving that his asylum application was filed within one year after the date of his arrival in the United States. The IJ found, and the BIA affirmed, that Majid had not carried this burden.

Section 208(a)(3) of the INA, 8 U.S.C. § 1158(a)(3), provides a "Limitation on judicial review": "No court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)" -- that is, any determination of whether the asylum seeker has met his burden of proof regarding the timeliness of the application. We have affirmed in dicta that this provision means what it says. See Niang v. Gonzales, 492 F.3d 505, 510 n.5 (4th Cir. 2007) ("It is worth noting that, even assuming [the petitioner] had not waived the timeliness issue with respect to her asylum claim, we lack jurisdiction to review the BIA's decision in this respect.") (citing 8 U.S.C. § 1158(a)(3)); Balde v. Gonzales, 223 F. App'x 265, 266 (4th Cir. 2007) (unpublished); Lin v. Gonzales, 190 F. App'x 301, 305 (4th Cir. 2006) (unpublished). Other circuits have similarly held that § 1158(a)(3) precludes review by federal courts. See Hana v. Gonzales, 503 F.3d 39, 42 (1st Cir. 2007); Yakovenko v. Gonzales, 477 F.3d 631, 635 (8th Cir. 2007); Tarrawally v. Ashcroft, 338 F.3d 180, 185 (3d Cir. 2003); Tsevegmid v.

9

Ashcroft, 318 F.3d 1226, 1230 (10th Cir. 2003); Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1217-18 (11th Cir. 2002); Hakeem v. INS, 273 F.3d 812, 815-16 (9th Cir. 2001); see also Tarraf v. Gonzales, 495 F.3d 525, 531 n.5 (7th Cir. 2007). We are therefore unable to review the timeliness of Majid's asylum claim.

## III.

Majid also challenges the denial of his application for withholding of removal. To qualify for withholding of removal, Majid must establish that if he was sent back to Afghanistan, there is a clear probability that his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "An applicant who has failed to establish the less stringent well-founded fear standard of proof required for asylum relief is necessarily also unable to establish an entitlement to withholding of removal." Anim v. Mukasey, 535 F.3d 243, 253 (4th Cir. 2008) (internal quotations removed). While "[a]n applicant who successfully demonstrates that she suffered past persecution on account of a protected ground is presumed to have [the] well-founded fear of persecution required for refugee status," Dankam v. Gonzales, 495 F.3d 113, 120 (4th Cir. 2007)

10

(internal quotations removed), "[b]ecause the subjective element cannot generally be proved other than through the applicant's testimony, an adverse credibility finding regarding testimony about fear of future persecution will likely defeat a claim unless the applicant introduces independent evidence of past persecution," Anim, 535 F.3d at 260 (internal quotations omitted). Here, Majid offered no evidence of past persecution beyond his own personal account, which the IJ and the BIA declined to credit. Accordingly, the BIA's denial of his claim for withholding of removal must be affirmed if we accept the IJ's adverse credibility determination.

"We review the BIA's administrative findings of fact under the substantial evidence rule, and we are obliged to treat them as conclusive unless the evidence before the BIA was such that any reasonable adjudicator would have been compelled to conclude to the contrary." Haoua v. Gonzales, 472 F.3d 227, 231 (4th Cir. 2007). When the BIA adopts the IJ's opinion and supplements it with its own reasoning, we review both decisions. Niang v. Gonzales, 492 F.3d 505, 511 n.8 (4th Cir. 2007).

When rendering an adverse credibility determination, an IJ must "offer a specific, cogent reason for his or her disbelief of the applicant." Zuh v. Mukasey, 547 F.3d 504, 507 (4th Cir. 2008) (internal quotations and alterations omitted). "Examples of specific and cogent reasons include 'inconsistent

11

statements, contradictory evidence, and inherently improbable testimony; [in particular,] where these circumstances exist in view of the background evidence on country conditions, it is appropriate for an Immigration Judge to make an adverse credibility determination on such a basis.'" Tewabe v. Gonzales, 446 F.3d 533, 538 (4th Cir. 2006) (quoting In re S-M-J-, 21 I. & N. Dec. 722, 729 (BIA 1997) (en banc)). In contrast, "we will not defer to adverse credibility findings based on speculation, conjecture, or an otherwise unsupported personal opinion." Zuh, 547 F.3d at 507. "[A]n alien's own testimony may in some cases be the only evidence available, and it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his alleged fear." Matter of Dass, 20 I. & N. Dec. 120, 124 (BIA 1989). Illusory inconsistencies do not, however, support an adverse credibility finding. See Zuh, 547 F.3d at 508. And while omissions of facts in an asylum application or during testimony do not, in themselves, support an adverse credibility determination, the omission of key events coupled with numerous inconsistencies may provide a specific and cogent reason to support an adverse credibility finding. In re A-S, 21 I. & N. Dec. 1106, 1109 (BIA 1998).

Here, the IJ based his adverse credibility determination on five independent grounds. Although not all of

12

the IJ's stated grounds withstand scrutiny, we conclude that, on balance, the IJ had cogent reasons for the determination.

The IJ first faulted Majid for a lack of detail in his testimony regarding his smuggled trip to the United States, including his alleged dates of travel and plane and boat routes. The IJ found Majid's account of his travel implausible, noting that: "Despite his education and training as a lawyer, [Majid] expresses a glaring lack of awareness of his surroundings during his smuggled trip into the United States." J.A. 190. The IJ went on to note that "[Majid] knows some English, a language present in most airports and on airlines, but he did not recognize the countries that he passed through or the airlines he took during his smuggled trip to the United States." Id. Further, the IJ observed that "[Majid] was in occasional possession of a false passport during his trip to the United States, but claims that he did not notice his alleged country of origin even though he saw his pictures inside the passport and passed through immigration control in one of the transit countries." Id.

Majid attempts to explain away these deficiencies in his account by claiming that he was frightened during the trip and was concerned with taking care of his wife (then five months pregnant) and two-and-a-half year old daughter. He notes that the IJ offered no basis for his claim that English signage is

13

present in most airports. And Majid questions how his training as a lawyer in Afghanistan is relevant to ascertaining information about his flight itinerary, which, as Majid explains, Asef sought to keep secret from Majid. Majid was instructed by Asef not to ask questions about the details of the travel.

Majid additionally supplied an affidavit from Kurt Lohbeck, an Afghanistan expert, which states that "the method of smuggling by men called[] 'Najeeb' and 'Asef' is typical of how such things worked prior to 9/11/2001." J.A. 84. Lohbeck affirmed that a cost of $25,000 "was within the norm" and that:

> For this Afghan family to stay in a place in Peshawar, Pakistan for less than two weeks, a place called Shobra Hotel, it is not uncommon for them not to have records. The hotels in Peshawar where refugees would go is [sic] very different from such places in this country. They are primitive, crude and most likely do not have records to be kept for proof of staying in the hotel.

Id.

We observe first that an assumption regarding what a person trained as a lawyer in Afghanistan would or would not have observed amounts to "speculation, conjecture, or an otherwise unsupported personal opinion" and is not a cogent reason that can support an adverse credibility determination. See Zuh, 547 F.3d at 507; cf. Cosa v. Mukasey, 543 F.3d 1066, 1068-69 (9th Cir. 2008) (rejecting IJ's credibility

14

determination based upon "pure speculation" about how someone of petitioner's purported religion might look and act); <u>Razkane v. Holder</u>, 562 F.3d 1283, 1287-89 (10th Cir. 2009) (rejecting IJ's determination regarding how person who is a homosexual would look and act). Similarly, we cannot base affirmance on the IJ's unsubstantiated assertion that "English [is] a language present in most airports and on airlines." J.A. 190. This assertion lacks any foundation in the record.

We do, however, accept the IJ's more general assessment that Majid's account of his voyage to the United States was lacking in detail. The IJ was permitted to cite this lack of detail as a cogent reason in support of an adverse credibility determination.

Second, the IJ supports his adverse credibility determination with what he perceived to be several inconsistencies in Majid's asylum application and testimony. As discussed below, because two of these inconsistencies are supported by the record, we conclude that these inconsistencies provide a second cogent reason to support the adverse credibility determination.

Specifically, the IJ found Majid's claim that his thirteen-month imprisonment by General Dostum resulted from his investigation into the general's alleged crimes to be inconsistent with his statement that he was accused by the

15

general of being a CIA spy. Majid claims that there is no inconsistency here because the accusations of being a CIA spy were pretextual and the real reason for Majid's arrest was his investigation into the general's alleged crimes. Majid provided the Lohbeck affidavit to the BIA in support of this contention. Majid's original affidavit in support of his asylum application, however, stated that the accusations of being a CIA spy were the result of his objection to communism, which the IJ was entitled to find inconsistent with Majid's later explanation and the Lohbeck affidavit.

The IJ also found inconsistent Majid's various accounts of the manner in which General Dostum learned of Majid's investigation into the general's criminal activities, and Majid's statements regarding whether he had ever filed a complaint against the general. We agree that Majid's affidavit and extensive testimony on these points was confusing and potentially contradictory, and the IJ was within his discretion to interpret them as inconsistent.

Third, the IJ concluded that Majid's demeanor, which "appeared unemotional and unaffected," was inconsistent with a person who alleged he had been tortured. J.A. 190. We review the IJ's assessment that Majid "appeared unemotional and unaffected" bearing in mind the IJ's superior ability to gauge the witness' demeanor. Zine v. Mukasey, 517 F.3d 535, 541 (8th

16

Cir. 2008). "[A] consistent story, independently supported in important respects and unmarred by implausibilities or inconsistencies, could not normally be disregarded merely because the witness -- especially one from a different culture and unversed in English -- simply struck the decision-maker as untruthful." Teng v. Mukasey, 516 F.3d 12, 16 (1st Cir. 2008). We are not faced with such a situation in this case. The IJ's adverse credibility determination hinges not only on Majid's unemotional demeanor, but on additional and independent cogent reasons: inconsistencies in Majid's accounts and a lack of detail. We therefore accept the IJ's conclusions regarding demeanor as supportive of the IJ's adverse credibility determination.

Fourth, the IJ found it "troubling" that Majid provided inadequate corroboration for his claim that he entered the United States within one year of his asylum application as well as regarding his claim of past and fear of future persecution. J.A. 191. The IJ observed that medical records or affidavits from Majid's coworkers, neighbors, or family members describing the circumstances of his arrest, prison conditions, or recovery from injuries inflicted through torture would "better support [Majid's] testimony." Id. Additionally, the IJ would have liked tangible evidence of Majid's trip to the United

17

States other than his unauthenticated letter from the Shobra Hotel in Pakistan.

"Although an applicant's credible testimony may be sufficient to carry his burden of proof, an IJ is entitled to evaluate the asylum-seeker's credibility and to require corroboration of self-serving testimony when such corroboration appears to be readily obtainable." Muñoz-Monsalve v. Mukasey, 551 F.3d 1, 8 (1st Cir. 2008). Here again, the IJ did not base his adverse credibility determination solely on Majid's lack of corroborating evidence, and, as we have explained above, the IJ offered several cogent reasons for the determination. Consequently, we need not determine whether the IJ was entitled to discount the credibility of Majid's testimony based Majid's failure to produce specific records.

We have some skepticism about the IJ's fifth basis for his adverse credibility determination. The IJ observed that Majid's testimony was "non-responsive when the DHS and this Court inquired into basic components of his story." J.A. 190. The IJ did not, however, specify which components of Majid's story he was referring to. And a review of the hearing transcript reveals that, while Majid's initial responses to certain yes or no questions were in the form of explanations rather than simple one-word answers, after prompting from the IJ, he did eventually answer each question. Additionally, few

18

of these yes or no questions pertained to material aspects of Majid's account. See, e.g., J.A. 340-41 (offering explanation rather than yes or no when asked whether General Dostum had been elected president of Afghanistan); J.A. 345 (initially nonresponsive when asked whether he informed his relatives he planned to flee Afghanistan); J.A. 353-54 (initially nonresponsive when asked whether communists and mujahidin in Afghanistan, whom Majid referred to as "hav[ing] been criminal," have ever been prosecuted); J.A. 358 (offering explanation rather than yes or no when asked whether he had attempted to contact the Karzai government to advise it of misdeeds of members of the government). To the extent Majid's answers to these questions may be attributed to language problems or nervousness, they do not form a proper basis for an adverse credibility determination. See Elias v. Gonzales, 490 F.3d 444, 450 (6th Cir. 2007). However, because the IJ offered several other cogent reasons in support of his determination, and his analysis largely supports the finding that Majid lacked credibility, we need not determine whether Majid's alleged nonresponsiveness provided a separate cogent reason.

In conclusion, the bases cited by the IJ for his adverse credibility determination in this case were, on balance, cogent, and the record does not compel a contrary conclusion. As explained above, because we accept the IJ's adverse

credibility determination, we will leave in place the IJ's conclusion that Majid has failed to establish the requisite fear of future persecution.

*    *    *

For the reasons stated above, we deny Majid's petitions for review of (1) the BIA's order denying his claims for asylum and withholding of removal and (2) the BIA's order denying his motion for reconsideration.

PETITIONS FOR REVIEW DENIED

20