**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-1441**

AKOUAVIDOVI DJONDO,

                    Petitioner,

          v.

ERIC H. HOLDER, JR., Attorney General,

                    Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  September 18, 2012       Decided:  November 9, 2012

Before NIEMEYER, SHEDD, and DAVIS, Circuit Judges.

Petition for review denied by unpublished per curiam opinion. Judge Davis wrote a dissenting opinion.

**ARGUED:** Matthew Weaver Steele Estes, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Washington, D.C., for Petitioner.  Lindsay Corliss, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:** Donald P. Salzman, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Washington, D.C., for Petitioner. Tony West, Assistant Attorney General, Civil Division, Daniel E. Goldman, Senior Litigation Counsel, Office of Immigration Litigation, Elliott Daniels, Law Clerk, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Akouavidovi Djondo, a native and citizen of Togo, was admitted into the United States in April 2005. Several months later, Djondo applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An Immigration Judge ("IJ") denied her application after making an adverse credibility finding, and the Board of Immigration Appeals ("BIA") affirmed the IJ's decision. Djondo now petitions for review, arguing that the BIA's decision is not supported by the record and the BIA failed to follow the requirements of the REAL ID Act. For the reasons that follow, we deny the petition for review.

I.

A.

Djondo is a native and citizen of Togo who entered the United States in April 2005. Djondo filed her application for asylum, withholding of removal, and protection under CAT on August 24, 2005, alleging that she had been persecuted in her home country for her political beliefs.

Togo had been under the control of General Gnassingbe Eyadema from 1967 until his death in 2005. While General Eyadema was in power, Djondo worked to bring political change in Togo as a member of the opposition political party, the

2

Convention Democratique des Peuples Africains ("CDPA"). When General Eyadema died on February 5, 2005, his son, Faure Gnassingbe, was installed as Togo's next president by the Rally of the Togolese People ("RTP"), the political party of his father. Faure Gnassingbe stepped down under international pressure on February 25. According to reports from the State Department and Amnesty International, two days later, on February 27, in response to the political upheaval in the country, a women's group that was part of the CDPA held a protest in Lome, Togo, during which the participants wore red. This rally was broken up when RTP security forces attacked the protestors, eventually resulting in five deaths.

B.

Djondo's application was based on her claim that she was attacked at this red-shirt rally in Lome. In her written application and in her testimony before the IJ, Djondo stated that she participated in the red-shirt rally and that after RTP security forces broke up the rally, they spotted her and attacked her, causing her to lose consciousness for a short time. According to Djondo, she eventually was assisted to her cousin's house, and her cousin took her to the hospital for treatment. Djondo then returned to her cousin's house to hide from the security forces. Throughout her written and oral

testimony, Djondo gave February 20 as the date of the rally where she was attacked.

In addition to her own testimony, Djondo offered the affidavit and testimony of her half-sister, Massan Gnininvi. Gnininvi testified that the rally was on February 20, that Djondo had attended the rally, and that, although Gnininvi was not present when Djondo was attacked, Gnininvi heard that people were beaten at the rally. Gnininvi's affidavit provides a similar account, including the February 20 date.

Djondo also offered written, unsworn statements from six Togolese citizens. The statement from Edoh Komla, Djondo's cousin, states that Djondo came to his house after the rally and hid there. Like Djondo and Gnininvi, he claims that the rally at which Djondo was beaten took place on February 20.[1] Two statements were from other members of the CDPA, who stated that Djondo was beaten by security forces at a rally in which participants wore red shirts. A statement from Djondo's husband claimed that Djondo was assaulted by security forces during a march, but that statement does not specify which march, other than saying the march was organized by women of the opposition party. The fifth statement is from Djondo's mother, who said

---

[1] Of these six written statements, only this one provided a specific date for the rally.

that Djondo had been a long-time opponent of the government. Her mother's statement did not discuss any details of the protest in February 2005, other than saying it was "the last straw that broke the camel[']s back." J.A. 685. The sixth and final statement was from the man who helped Djondo get to the United States; it said nothing specific about a rally in February 2005.

Finally, Djondo offered photographs of the rally, her CDPA membership card, and an attestation of her CDPA membership. She also included country reports on Togo from the State Department and Amnesty International.

## C.

The IJ rejected Djondo's application.[2] The IJ found that the evidence showed that Djondo was a member of the CDPA but did not support a credible claim that she was entitled to the relief she sought. Applying the REAL ID Act, 8 U.S.C. § 1158(b)(1)(B)(iii), the IJ stated that Djondo's "claim is not consistent with the evidence that she provided on country conditions" and that there was a "discrepancy which relates to

---

[2] This was the second time the IJ had rejected Djondo's claim. The first time Djondo's application was denied, the IJ refused to consider the documentary evidence because the translation certifications did not comply with applicable rules. Djondo appealed, and the BIA remanded the case with instructions to consider that evidence.

5

[Djondo's] claim of having been arrested and detained during the course of the march that she described as having occurred on February 20, 2005." J.A. 14. The IJ did not find credible Djondo's explanation that she forgot or could not remember the correct date. Regarding the supporting documents, the IJ noted that one document used the same incorrect date—February 20, 2005—for the red-shirt rally and that the other documents lacked specifics about the rally at which Djondo claimed she was attacked. The IJ likewise decided that the photographs of the rally were insufficient because Djondo could not be seen in them.

The BIA affirmed the IJ's decision. The BIA, also applying the REAL ID Act, upheld the IJ's credibility determination. It noted that Djondo's testimony and written application, as well as Gnininvi's testimony and affidavit and Edoh Komla's letter, all used the same incorrect date of February 20, 2005. The BIA also upheld the IJ's determination that the other evidence did not support Djondo's claim, concluding that the evidence was "insufficient to bolster [Djondo's] already questionable version of events." J.A. 5.

II.

Djondo now petitions for review of the denial of her claim for asylum, withholding of removal, and protection under CAT.

6

When reviewing the BIA's decision, we must uphold the decision so long as it is not "manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). Thus, we must accept the BIA's decision unless the evidence "compels" a contrary conclusion. Dankam v. Gonzales, 495 F.3d 113, 119 (4th Cir. 2007) (quoting I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992)) (emphasis in original).

An IJ's determination of a witness's credibility is governed by the REAL ID Act, which provides:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii). The IJ's findings that an applicant was not credible are "entitled to judicial deference if such findings are supported by substantial evidence." Dankam, 495 F.3d at 119.

Although the IJ's findings of fact are given broad deference, that deference is not absolute. Camara v. Ashcroft,

7

378 F.3d 361, 367 (4th Cir. 2004). For the court to uphold a decision that the witness was not credible, an IJ "should offer a specific, cogent reason for [her] disbelief." Id. "Examples of specific and cogent reasons include inconsistent statements, contradictory evidence, and inherently improbable testimony; [in particular,] where these circumstances exist in view of the background evidence on country conditions, it is appropriate for an Immigration Judge to make an adverse credibility determination on such a basis." Tewabe v. Gonzales, 446 F.3d 533, 538 (4th Cir. 2006) (alteration in original) (internal quotation mark omitted). On the other hand, that determination may not be based on "speculation, conjecture, or an otherwise unsupported personal opinion." Id. (quoting Dia v. Ashcroft, 353 F.3d 228, 250 (3d Cir. 2003) (en banc)).

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum to an alien who qualifies as a refugee under 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1)(A); see also Dankam, 495 F.3d at 115. A refugee is "someone 'who is unable or unwilling to return to' [her] native country 'because of persecution or a well-founded fear of persecution on account of . . . political opinion' or other protected grounds." Id. (quoting 8 U.S.C. § 1101(a)(42)(A)) (omission in original). Proving a well-founded fear of persecution has both a subjective and an objective component.

8

Camara, 378 F.3d at 369. Alternatively, if a petitioner can show past persecution, a presumption of a well-founded fear arises. Id. at 369-70. Thus, even if the trier of fact has determined that the petitioner's testimony is not credible, the BIA must consider independent evidence of past persecution. Anim v. Mukasey, 535 F.3d 243, 252 (4th Cir. 2008). The person seeking asylum has the burden of showing that she meets these requirements. Djadjou v. Holder, 662 F.3d 265, 272 (4th Cir. 2011).

The INA also provides for the withholding of removal. 8 U.S.C. § 1231(b)(3). The burden for prevailing on this claim is higher than under an asylum claim because to succeed on the withholding claim, the petitioner must "demonstrate a 'clear probability of persecution' on account of a protected ground." Dankam, 495 F.3d at 115 (quoting INS v. Stevic, 467 U.S. 407, 430 (1984)). Protected grounds include "race, religion, nationality, membership in a particular social group, or political opinion." Haoua v. Gonzales, 472 F.3d 227, 232 (4th Cir. 2007) (citing 8 U.S.C. § 1231(b)(3)(A)). Because the burden of proof for withholding of removal is higher than for asylum, an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal. Camara, 378 F.3d at 367. If a person meets this higher burden, however, relief is mandatory. Id.

The CAT "prohibits the United States from returning any person to a country where the person has demonstrated that it is more likely than not that [s]he will be tortured if returned to such country." Zelaya v. Holder, 668 F.3d 159, 161 (4th Cir. 2012). The reason that the person would be tortured is irrelevant; all that matters is that the person has shown that torture is more likely than not, Dankam, 495 F.3d at 115–16, applying an objective standard, Camara, 378 F.3d at 371. As with asylum and withholding of removal claims, the petitioner bears the burden of showing these requirements are met. 8 C.F.R. § 208.16(c)(2).

## III.

Djondo argues that the record does not support the BIA's decision and that the BIA did not follow the REAL ID Act in making the adverse credibility determination, but we disagree. Applying these standards, we conclude that the record contains substantial evidence to uphold the BIA's decision.

The BIA rejected Djondo's assertion that the simple mistake of one date was the basis for the adverse credibility determination. Instead, the BIA noted that the mistaken date appears not only in Djondo's testimony and written application, but also in Gnininvi's testimony and affidavit and in the statement from Edoh Komla. Far from being a one-time mistake,

10

this repeated error was the only specific date that Djondo offered for the date of the rally in any of the oral or written evidence from people who claimed to have firsthand knowledge of events. This error—from Djondo, Gnininvi, and Komla—directly conflicted with the date of the rally noted in reports from the State Department and Amnesty International, which the IJ found "far more probative."[3] J.A. 300-01. The IJ asked Djondo about this mistake, and the IJ did not credit her answer that she simply forgot or could not remember. J.A. 4, 14-16. Given that the IJ heard Djondo's testimony and explanation for the incorrect date, the IJ's rejection of that explanation deserves great deference. See Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 623 (1993) (noting that "the factfinder is in a better position to make judgments about . . . . the credibility of a live witness").

In addition, in reaching its adverse credibility determination, the BIA fully complied with the requirements of the REAL ID Act. The BIA and the IJ both expressly cited the

---

[3] Djondo's evidence raises other questions as well. For instance, Djondo testified that after she arrived at her cousin's house, her cousin took her to the hospital. J.A. 592. Her cousin, however, never mentioned any trip to the hospital in his written statement; instead, he said that he had to "hide her" in his house "to save her." J.A. 678.

11

REAL ID Act and noted that their decisions were based on "the totality of the circumstances." J.A. 4, 14. The BIA was not required to discuss—or even list—every factor in the REAL ID Act in discussing Djondo's credibility. Cf. Zuh v. Mukasey, 547 F.3d 504, 511 (4th Cir. 2008) (holding, in the context of the BIA exercising its discretion in denying asylum to an alien qualifying as a refugee, that "an IJ need not analyze or even list every factor"). Djondo contends that the BIA should have responded to more of her arguments about why her testimony was credible, but the REAL ID Act imposes no such requirement. The REAL ID Act merely requires that the BIA's decision be based on the totality of the circumstances and all relevant factors. The BIA and the IJ based their decisions on that standard, J.A. 4, 14, and in their decisions, both discussed the evidence and factors on which their conclusion was based.[4] They gave a cogent reason—the repeated wrong date—as the basis for the decision.

---

[4] In Zuh, we noted that when the BIA decides, in its discretion, to deny asylum to a qualifying refugee, the IJ "must discuss the positive or adverse factors that support his or her decision." Zuh, 547 F.3d at 511. Djondo argues that this language required the IJ to discuss the factors that suggested her claim was credible. The language on which Djondo relies does not compel such a result: that language uses "or," meaning that the IJ need not discuss both positive and adverse factors; rather, the IJ need only discuss the factors that support the decision. So long as the record demonstrates that the IJ considered the relevant factors, the IJ has met her obligations. See id. Here, the BIA and IJ did just that. J.A. 4, 14.

12

See Tewabe, 446 F.3d at 538.  The decision therefore satisfied the requirements of the REAL ID Act.

Despite Djondo's assertion to the contrary, the BIA did not need to explain why this erroneous date was material.[5]  Before Congress passed the REAL ID Act in 2005, "contradictions that [did] not go to the heart of the applicant's claim . . . [did] not necessarily support an adverse credibility determination." Djadjou, 662 F.3d at 274.  The REAL ID Act, however, changed this standard, removing this materiality requirement and thus allowing any inconsistency or inaccuracy, "without regard for whether [it] goes to the heart of the applicant's claim," to serve as the basis of an adverse credibility determination.  8 U.S.C. § 1158(b)(1)(B)(iii); see also Singh v. Holder, - F.3d - (4th Cir. 2012) (recognizing this change resulting from the REAL ID Act).  Here, the BIA relied on the same repeated use of the wrong date for the rally as the basis for the adverse credibility determination.  The REAL ID Act allows the BIA to

---

[5] The mistaken date is, in any event, likely very material. Djondo claimed the rally was designed to push Faure Gnassingbe to step down after his extraconstitutional installation as president.  J.A. 623.  On February 20, 2005, this purpose would have made sense, as Faure Gnassingbe was still in power.  On February 27, 2005, however, this purpose would not have made sense because Faure Gnassingbe had stepped down two days earlier, on February 25.

13

make the adverse credibility determination based on this error, whether or not it went to the heart of Djondo's claim.

In addition to the repeated error about the date, the BIA also considered and rejected the other evidence that Djondo presented. See Camara, 378 F.3d at 369-70 (noting that although an adverse credibility determination is often "fatal" to an asylum claim, such a finding is not necessarily fatal if the other evidence can demonstrate past persecution). In this case, the letter attesting to Djondo's CDPA membership never mentioned any persecution, despite being obtained for purposes of Djondo's asylum claim. J.A. 5, 646. The letters from Togolese citizens offered little or no specifics about the rally at which Djondo claimed she was beaten. J.A. 16-17, 653-87. The photographs did not show Djondo in the crowd. J.A. 5, 703-04. The BIA thus sufficiently considered and rejected this evidence in evaluating Djondo's application. See Ganziami-Mickhou v. Gonzales, 445 F.3d 351, 358 (4th Cir. 2006) (holding that the IJ does not need to "discuss each item's individual worth" in rejecting these documents as incredible, so long as the IJ did not ignore them).

Because Djondo offered the same evidence in support of all three claims, the rejection of her evidence for purposes of one claim means that the evidence must be rejected for all claims. See Zuh, 547 F.3d at 513 ("An IJ cannot have it both ways, finding an applicant and [her] documents incredible for one

14

purpose and yet relying on them for another."). Thus, Djondo's claims for asylum, withholding of removal, and protection under CAT all fail.

## IV.

Ultimately, Djondo's evidence does not compel us to reach a result contrary to the BIA's conclusion. Regardless of whether another factfinder would have found Djondo's claim credible, the BIA found that Djondo was incredible and had not carried her burden to show that she was entitled to asylum, withholding of removal, and protection under CAT. The record contains substantial evidence to support that conclusion. Therefore, we affirm the BIA's decision and deny the petition for review.

PETITION FOR REVIEW DENIED

DAVIS, Circuit Judge, dissenting:

For the reasons set forth within, I respectfully dissent.


I.

Akouavi Dovi Djondo[1] is a 56-year-old woman from Togo, which was ruled for 38 years by Gnassingbe Eyadema ("Eyadema") until his death on February 5, 2005. According to the U.S. Department of State, following "constitutional changes" and "quick action by the military," Gnassingbe's son, Faure Gnassingbe ("Faure"), was installed as the new president. J.A. 706. On February 7, 2005, the Togo government "banned all street demonstrations for two months in observance of a national mourning period for the late president Eyadema." Id. at 713. Although the ban was purportedly lifted on February 18, 2005, on February 27 "security forces forcefully dispersed a peaceful women's march, beating persons with batons and firing tear gas into the crowds." Id. Five people were killed, and when their bodies were

---

[1] The parties spell the petitioner's first name as Akouavidovi, and that is how it is spelled on the docket. Her affidavit and application for asylum and withholding of removal, however, list her first name as Akouavi and her middle name as Dovi. See J.A. 179, 621.

16

found, they "had contusions consistent with having suffered beatings from batons."[2]

Djondo came to the United States on April 15, 2005, and on August 5, 2005, filed an application seeking asylum and withholding of removal based on political persecution and membership in a particular social group, as well as withholding of removal under the Convention against Torture (the "CAT"). The Immigration Judge ("IJ") denied relief, and the Board of

_____

[2] J.A. 713. This is how the State Department describes the events in Togo surrounding the women's march that Djondo claims she participated in, and is at the core of her claim:

> On February 5, 2005 President Gnassingbe Eyadema died. In an unconstitutional move, the military leadership swore in Faure Gnassingbe, the late President Eyadema's son, as president. Immediate condemnation by African leaders followed by sanctions of the Economic Community of West African States and the African Union combined with pressure from the international community led finally to a decision on February 25 for Faure Gnassingbe to step down. Protest efforts by the public included a large demonstration in Lome [the capital of Togo] that was permitted to proceed peacefully. Prior to stepping down, Faure Gnassingbe was selected as leader of the ruling party and named as a candidate in the announced presidential elections to choose a successor to Eyadema. Abass Bonfoh, National Assembly Vice President, was selected to serve as Speaker of the National Assembly and therefore simultaneously became interim President. Real power apparently was retained by Faure Gnassingbe as he continued to use the offices of the President while the interim President operated from the National Assembly.

Background Note: Togo (February 17, 2012), http://www.state.gov/ outofdate/bgn/togo/196489.htm (last visited October 17, 2012).

17

Immigration Appeals ("BIA") affirmed. In my view, the record before us, taken as a whole in its full sweep, compels us to reject the IJ's adverse credibility determination as lacking a cogent foundation. Accordingly, I would grant the petition and remand the proceedings.

A.   Djondo's Affidavit

In the affidavit attached to her asylum application, Djondo explained that her family had long been "strongly involved in politics." J.A. 752. Prior to Eyadema's coup in 1967, Djondo's father had "actively participated" in Togo's struggle for independence in the 1950s and early 1960s, and after Eyadema came to power was persecuted by the regime. Id. In 1976, Djondo and other youths were "savagely beaten" and arrested after opposing government efforts to interfere with a ceremony of the Catholic Church. Id. Her half brother Leopold Messan Gnininvi served as Secretary General of the Convention Démocratique des Peuples Africains ("CDPA"), an opposition party. Id. at 586–87.

Djondo elevated her political involvement in 1990, when Togo was "at the edge of the civil war." J.A. 753. She "strongly believed" the country would be "freed from the tyranny," and "secretly joined" the CDPA. Id. In January 1993, she participated in a "big demonstration" to welcome a delegation from the European Union. Id. "Unfortunately, militaries came to disrupt the crowd using their machine[] guns. Many were killed

18

and other[s] w[ere] wounded. [She] was also beaten and injured." Id. That experience deterred her from more political involvement for a number of years. Id.

Initially her work for the CDPA was on an informal basis. See J.A. 753. In 2002, however, she became "an official member of CDPA," of which Leopold Gnininvi had become Secretary General. Id. at 586. In May 2002 she became a "counselor for the national CDPA's women wing," and was "the local chapter's vice-president." Id. at 754. At the time, they worked to support the opposition to Eyadema, leading up to an election scheduled for June 2003. Id. In 2003, however, "everything turn[ed] to a disaster." Id. She had to "move from [her] area to stay in [her] husband['s] second house in Hedzranawoe for future reprisal or a persecution." Id.

In 2005, upon Eyadema's death, she and others thought things would change such that they would be "free to talk freely." J.A. 754. Accordingly, "women of the opposition organized a march to ask[] the son of late EYADEMA to step down and put Mr. NATCHABA[3] in the presidency according to our constitution." Id. In the affidavit, Djondo stated that the

_____

[3] Natchaba Ouattara was the president of the National Assembly at the time of Eyadema's death. See United Nations High Commissioner for Refugees, "World Directory of Minorities and Indigenous Peoples – Togo: Overview," www.unhcr.org/refworld/publisher,MRGI,,TGO,4954ce5cc,0.html (last visited October 26, 2012).

19

march was on February 20th. Id. She explained that she was "beaten savagely" by "RPT[4] militia loyal to Faure" for being "a participant of that march." Id. The militia "came directly to [her] house" and "threat[ened]" her. Id. "It was very hard for me to live in that fear," she explained, "so I left the country before the April 24th election." Id. She first went to a refugee camp in Benin, and then came to the United States. See id. Djondo "decided to stay here for fear [of] persecution since the Gnassingbe [were] still in the power." Id. She said, "I cannot go back to my country because we have a hereditary dictator[ship] that kills us morally and physically." Id.

B.    Djondo's Testimony

On October 25, 2005, the Department of Homeland Security ("DHS") initiated removal proceedings, charging her with being subject to removal for having overstayed the visa. See Immigration and Nationality Act ("INA") § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). On September 20, 2006, Djondo appeared with counsel before an immigration judge, conceded removability, renewed her asylum application under INA § 208(a), 8 U.S.C. § 1158(a), and also requested withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and CAT protection. As the

---

[4] The Rassemblement du People Togolais ("RPT") is Eyadema's party. See Background Note, supra note 2.

20

Attorney General concedes, at the hearing Djondo "testified consistently with her written affidavit." Gov't Br. at 4; see J.A. 534-618 (hearing transcript). She explained that she had been involved with the CDPA "from the beginning," although she did not "officially" join the party until 2002, at which point she "got a membership card." Id. at 587. She explained that she participated in a march on February 20, 2005, with the "opposition components." Id. at 586, 589-91. "We were requesting the . . . reinstallation of the constitution, that Eyadema's son [Faure] cannot become just the president after the death of his father," she testified. Id. at 590. "Everybody was wearing the red t-shirt," she explained, id. at 602-03, because "[i]t means that the country is in danger"; that was "our way to show our discontent," id. at 591.

Djondo testified that the march began as a peaceful demonstration, but the RPT militia "made it a point to attack anyone wearing a red shirt coming from that demonstration." J.A. 591-92, 603. She knew that they were RPT militiamen because they were her neighbors, and they also wore "t-shirts with the RPT logo." Id. at 591-92, 605. They chased her, "attacked" her, and beat her with "big sticks," clubs and bats, leaving her unconscious. Id. at 591. Passersby found her and brought her to

21

her cousin's home. Id. at 591-92, 610. Her cousin took her to a hospital for medical treatment.[5]

The immigration judge specifically asked her the date of the march:

> Q: When were you beaten up?
>
> A: I was beaten up on February 20th.
>
> Q: February 20th?
>
> A: February 20th.

J.A. 589. The date of the march became crucial because DHS counsel pointed out to the IJ that, of the demonstrations described in the State Department reports, none of them occurred on February 20. The judge confronted Djondo with this information:

> There are some reports attached to your asylum papers, which tell me what was happening in Togo in February of 2005. One report talks about protesters and demonstrations in Lome. And the dates they give for those protests are February 9th, February 11th, February 12th and February 27th. . . . [T]hey say that the February 27th . . . march was a peaceful women's march. . . . [T]he next report . . . refers to demonstrations that were organized for February 23rd, 2005. And it refers to a February 27th, 2005, march organized by women's organizations. And it says that the organizers of this march, organized by the women's

---

[5] J.A. 592. Djondo did not produce records of her medical treatment. When asked why, she explained that, when she went to the hospital on "February 20th," she "was given only the first care and prescription. I received no other document." Id. at 601. She explained that she did not try to acquire them later because she "[did] not know that the proceeding would require the presentation of these documents." Id. at 601-02.

22

organizations, asked the population to dress in red. And I don't see any reference to a February 20th, 2005, women's march. Do you know why that would be in two different reports?

Id. at 603-04. She responded:

Yeah. I took part in the one requesting the demonstrators to wear red shirts. And when the attack took place, maybe I can't remember exactly the dates. But the one requesting the participants to wear red shirts is the one I took part in. . . . [A]fter what's happened to me, I can't remember exactly the date. I know that it was in the 20's, and I was saying the 20th. But I took part in the one [where] we were requested to wear red shirts.

Id. at 604-05.

Djondo testified that, after the march, she was unable to go home because she was scared the militia would arrest or kill her. J.A. 596. In fact, she later learned that the RPT militia did go "back to the house . . . to look for [her]." Id. Accordingly, she "tried to . . . leave the country," but "unfortunately, [her] passport [had] expired." Id. at 589. She stayed with her cousin until she was able to acquire a passport, and left the country for Benin approximately two months later, on April 14, 2005. Id. at 589, 592, 595. Djondo's husband and children also were forced to leave their home, and fled to Benin sometime after Djondo did. Id. at 594-95.

Djondo testified that she is afraid to return to Togo because she is "still scared that [she'll] be arrested." J.A. 588. Her sister who remained in Togo told her "[t]hey continue

23

looking for [her]." Id. at 607. Djondo explained, "If I go back to Togo, they will kill me immediately. And I'm, I'm scared. I'm afraid." Id. at 597. And "if I go back [and] they find out that I came to the United States and applied [for] asylum, . . . they're going to arrest me or kill me."[6]

C. Djondo's Documentary Evidence

Djondo also submitted documentary evidence to corroborate her affidavit and oral testimony about her involvement in the CDPA and the February 2005 women's march:

(1)  two photographs of the demonstration in which she claimed to have participated, J.A. 703-04;

(2)  a CDPA Membership Card, confirming her membership in CDPA, id. at 642-44; and

(3)  the attestation of CDPA Membership from a CDPA official, stating that Djondo is "is a very active member in the affairs of the party," id. at 646-47.

Djondo also submitted reports from the State Department and Amnesty International about the February 2005 march. The State

---

[6] J.A. 599. The DHS lawyer asked why Leopold Gnininvi, a prominent leader, could stay in Togo but conditions were too dangerous for Djondo to return. Id. at 587. Djondo explained, "[T]hey who are the top leaders of the opposition parties – they don't harm them. . . . [T]hey always focus on people around, around them." Id. The DHS lawyer asked why another sibling can safely live in Togo. Id. at 589. "[S]he's not at all involved in political activities," Djondo explained. Id.

24

Department's 2005 Country Report for Togo described the demonstration as follows:

> On February 27, security forces forcefully dispersed a peaceful women's march, beating persons with batons and firing tear gas into crowds. Five persons were killed in the course of this demonstration . . . . All of the bodies had contusions consistent with having suffered beatings from batons.

J.A. 713. Amnesty International provided more detail in its report, "Togo, A High Risk Transition":

> On the following Sunday, 27 February 2005, a march organised by women's organisations took place in Lomé. The organisers asked the population to dress in red, to symbolise that democracy was in danger in Togo. There were clashes between security forces and several demonstrators at the end of the demonstration. The security forces chased some demonstrators into the Bè neighbourhood, a traditional opposition stronghold. It seems that these demonstrators erected barricades and that clashes took place right through until the following morning, when the security forces began indiscriminate repression of people in the neighbourhood, forcibly entering homes, beating up anyone in their way and, according to some reports, making threats of rape. . . .
>
> The next day, five bodies, including a child aged around 10, were found in Bè Lagoon. . . .
> On 28 February, the security forces forcibly entered private homes and hit residents in a brutal and indiscriminate manner. . . .

J.A. 737-38 (emphases omitted). As discussed below, the only inconsistency between these reports and Djondo's testimony was the date of the march (February 20 vs. February 27).

D.   Djondo's Other Evidence

Djondo presented other evidence in support of her petition:

25

Testimony of Lily Massan Gnininvi (J.A. 557-84) – Djondo's half-sister Lily Massan Gnininvi testified about Djondo's active participation in the CDPA and personal background, as well as Djondo's participation in the February 2005 march. J.A. 560-62. Although Gnininvi was not with Djondo when Djondo was beaten, Gnininvi described the demonstration in detail, and testified that she saw Djondo at the demonstration. Id. at 562-66. She also testified that she heard from another sister that Djondo had been beaten. Id. at 566, 569. Thus, her testimony was entirely consistent with Djondo's. She did, however, testify that the march was February 20, not February 27 as reported by the State Department and Amnesty International.

Affidavit of Lily Massan Gnininvi (J.A. 651) – This was consistent with Gnininvi's testimony.

Written statements by Togolese citizens – Djondo submitted six written, unsworn statements from people who stated that Djondo participated in the red-shirt rally and was, for example, "savagely beaten" because the RPT militia "saw her in red attire." J.A. 665. All but one of the statements did not provide a precise date for the rally. See id. at 671-75 (Abotchi Akossiwa Odile ); id. at 665-69 (Dotse Ama Eyako); J.A. 660-63 (Gayegnigogo Kuevidjin); id. at 653-58 (Agbemehe Akoétey Kossi); id. at 685-87 (Djondo Ablavi). The one person who included a

26

precise date stated that the march took place on February 20, 2005. See id. at 677-82 (Edoh Semeho Komla).

E.    Agency Proceedings

At the hearing before Immigration Judge Lisa Dornell, Djondo argued that she satisfied the requirements for asylum. Although the Attorney General did not dispute most of the facts, he argued that Djondo's claim failed because "it's difficult to believe that five years later that she is in danger because of some mass march activity that she was involved in such a long time ago." J.A. 616.

The IJ orally rejected Djondo's claim for asylum and withholding of removal. This decision relied, however, on her earlier decision to exclude from evidence all of the written statements that Djondo submitted as well as the CDPA membership card, on the ground that the certificates of translation provided for those documents did not state that the translator was competent to translate the document and that the translation was true and accurate. J.A. 514. Having excluded that evidence, the IJ explained, in pertinent part, why she was rejecting Djondo's claims:

> [T]his is not a case in which the respondent can rely on her testimony alone. That is because her testimony concerning the events which led to her departure from Togo is not consistent [with the State Department and Amnesty International reports]. It is not plausible in light of information on country conditions. . . .

27

[I have] considered the respondent's explanation that she simply forgot the date or that she could not remember the date. That explanation is not persuasive in light of the fact that that is the date that the respondent has written in her application. . . .

Even more significant is the fact that [Gnininvi] insisted that [the march] occurred on February 20, 2005. There is no explanation as to, even if the respondent were mistaken, why her witness would come in and swear under oath that it was on February 20, 2005, that she saw the respondent participating in this demonstration which ultimately led to her decision to flee Togo.[7]

So, the respondent cannot rely on her testimony . . .

Id. at 520-21. The IJ also noted that, even if the excluded evidence were admitted, it "would not have been deemed by the Court to be credible" because they also contained "conflicting information about the demonstration." Id. at 522.[8]

Djondo appealed to the BIA, which reversed in a per curiam opinion on two grounds. First, the BIA held that the IJ improperly excluded most of Djondo's witness statements, because

---

[7] As Djondo notes:

The Immigration Judge's reliance on Ms. Gnininvi's failure to explain why she testified that the demonstration was on February 20 is puzzling, given that no one asked Ms. Gnininvi to provide such an explanation. Ms. Gnininvi testified before Ms. Djondo, and the discrepancy in dates was not raised by the Immigration Judge until she questioned Ms. Djondo. See J.A. 603-04. Nor did counsel for the DHS ever ask Ms. Gninninvi to explain the difference.

Pet. Br. at 24.

[8] As mentioned, this was incorrect; only one of the written statements included the February 20 date.

28

the translator certificates "substantially complied" with the applicable regulation, 8 C.F.R. § 1003.33. J.A. 143. Second, the BIA held that the IJ "failed to analyze the respondent's applications under the REAL ID Act of 2005." Id. The BIA remanded for the IJ to reconsider her credibility finding in light of the previously excluded documentary evidence, and under the REAL ID Act. Id. at 143–44.

On remand, Djondo moved for permission to have her application considered de novo. See J.A. 101. The IJ denied the motion, instead ruling on the application without hearing additional evidence. Id. at 101. Reaching the merits, the IJ again denied Djondo's claims:

> [T]he Court observes that previously-excluded evidence supports the respondent's claim that she was a member of the CDPA. . . .
>
> However, even considering the previously-excluded evidence, and taking into consideration the totality of the circumstances as the Real ID Act requires, the respondent has not advanced a claim that is credible. This is an adverse credibility claim. There is a material discrepancy which relates to the respondent's claim of having been arrested and detained during the course of a march that she described as having occurred on February 20, 2005. This is a case, in short, in which the respondent's claim is not consistent with evidence that she has provided on country conditions. This is a case in which the respondent's testimony is not consistent with testimony provided by her own witness[.][9] [T]he Court notes that in the respondent's filings subsequent to

---

[9] This observation is wrong. Gnininvi testified to the same (mistaken) date of the march as did Djondo: February 20, 2005.

the remand, she notes that asylum applicants come to the Court suffering from some degree of trauma. However, the Court observes that notwithstanding the trauma that applicants for asylum protection may have suffered, they still are responsible for carrying various legal burdens. They have to file their asylum application in a timely fashion. They have to present evidence that is credible, direct and specific.

And the Court observes that in this case, specifically, there is certainly no evidence to show that the respondent has been so traumatized that she cannot testify, cannot be expected to testify, in a manner that is consistent with her own evidence. . . .

Id. at 90-91 (emphasis added). The IJ then addressed the previously excluded documents, but discounted their weight, stating that Gandziami-Mickhou v. Gonzales, 445 F.3d 351 (4th Cir. 2006), "calls into question the probative value of such unsworn documentation." Id. at 92. For these reasons, the IJ concluded, Djondo "has not shown with her evidence that she, herself, was involved in that activity [the February 27, 2005, women's march] at the time that her information on country conditions says those activities occurred." Id. at 93.

On appeal, the BIA affirmed. First, the BIA affirmed the IJ's adverse credibility determination, finding it complied with the REAL ID Act:

Contrary to the respondent's assertion that it was only her faulty recollection of one date that formed the basis of the Immigration Judge's adverse credibility finding, it was the faulty date repeated in her testimony, her written application, her witness's testimony, and her various corroborating letters that concerned the Immigration Judge. . . .

30

When the respondent was confronted with this inconsistency, she stated she simply forgot the date or could not remember the date, which was not a convicting explanation to the Immigration Judge. The Immigration Judge was not persuaded that [Djondo] simply forgot or could not remember when this was also the date in her written application, the date her witness testified she saw the respondent participating in the demonstration that led to her arrest and decision to flee Togo, and the date reflected in her other allegedly corroborating letters that the respondent appeared at this rally on February 20, 2005, and fled from the militia on that day.

J.A. 4 (citations to record omitted). Second, the BIA affirmed the IJ's decision that Djondo's supporting documentation also was insufficient to satisfy her burden of showing past persecution, a reasonable likelihood of future persecution on account of a protected ground, or a clear probability that her life or freedom would be threated on account of a protected ground if she were to return to Togo:

[T]he political membership document and letter from her political organization do not describe any incidents of harm or persecution suffered by the respondent in Togo. The Immigration Judge thought that had the writer of the letter known of instances of persecution and harm that it would have been reflected in the letter. Furthermore, the photos and other documentation that she produced were insufficient to bolster her already questionable version of events. For instance, her pictures did not necessarily corroborate the time or place of the event recorded and many of her documents were not under oath. See Gandziami-Mickhou v. Gonzales, 445 F.3d 351[, 354] (4th Cir. 2006) (discussing the limited probative value of unsworn documentation).

Id. at 5 (citations to record omitted). Accordingly, the BIA found no "clear error in the determination that the respondent

31

was not credible," and thus that she "failed to carry her burden for demonstrating eligibility for asylum or withholding of removal." Id. Thus, the BIA affirmed the IJ's denial of Djondo's claims for asylum, withholding of removal, and CAT relief.

Djondo timely filed a petition for review.


II.

A.

We recently described the standards for asylum, mandatory withholding of removal, and protection under CAT:

> Under the Immigration and Nationality Act (the INA), the Attorney General has discretionary authority to "grant asylum to an alien . . . if . . . the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of [Title 8]." 8 U.S.C. § 1158(b)(1)(A). Section 1101(a)(42)(A) in turn defines the term "refugee" as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group. . . ." Id. § 1101(a)(42)(A). "The burden of proof is on the applicant [for asylum] to establish that the applicant is a refugee, within the meaning of section 1101(a)(42)(A)." Id. § 1158(b)(1)(B).[10]

---

[10] An asylum applicant "may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R. § 208.13(b). Further, "[a]n applicant who demonstrates that [s]he was the subject of past persecution is presumed to have a well-founded fear of persecution." Ngarurih v. Ashcroft, 371 F.3d 182, 187 (4th Cir. 2004).

32

<u>Zelaya v. Holder</u>, 668 F.3d 159, 161 (4th Cir. 2012) (alterations in original). In addition, an application for asylum is "deemed to constitute at the same time an application for withholding of removal." 8 C.F.R. § 208.3.

> Unlike in the asylum context, if an alien qualifies for withholding of removal under the INA, the Attorney General cannot remove him to his native country. <u>Id.</u> § 1231(b)(3)(A); <u>Camara v. Ashcroft</u>, 378 F.3d 361, 367 (4th Cir. 2004). "Withholding of removal is available under 8 U.S.C. § 1231(b)(3) if the alien shows that it is more likely than not that h[is] life or freedom would be threatened in the country of removal because of h[is] ' . . . membership in a particular social group . . . .' " <u>Gomis v. Holder</u>, 571 F.3d 353, 359 (4th Cir. 2009) (quoting 8 U.S.C. § 1231(b)(3)(A)), cert. denied, --- U.S. ---, 130 S.Ct. 1048 (2010). This is a higher burden of proof than for an asylum claim, although the facts that must be proven are the same. <u>Camara</u>, 378 F.3d at 367. Accordingly, an alien who cannot meet his burden of proof on an asylum claim under the INA necessarily cannot meet his burden of proof on a withholding of removal claim under the INA. <u>Id.</u>

<u>Zelaya</u>, 668 F.3d at 161 (alterations in original). Finally, Djondo sought protection under the CAT, which

> pursuant to its implementing regulations, prohibits the United States from returning any person to a country where the person has demonstrated that it is more likely than not that he will be tortured if returned to such country [citation omitted]. For purposes of obtaining protection under the CAT in the United States, torture is defined as:

>> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third

person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. §§ 208.18(a)(1) (Department of Homeland Security regulation), 1208.18(a)(1) (Executive Office for Immigration Review regulation). A public official acquiesces to torture if, "prior to the activity constituting torture, [the public official] ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." Id. § 1208.18(a)(7). "The testimony of the applicant" for withholding of removal under the CAT, "if credible, may be sufficient to sustain the burden of proof without corroboration." Id. § 1208.16(c)(2).

Zelaya, 668 F.3d at 161-62 (footnotes omitted). "[T]his standard for the CAT is independent from the standard for determining asylum, and an adverse credibility finding alone cannot preclude protection under the CAT." Gandziami-Mickhou v. Gonzales, 445 F.3d 351, 354 (4th Cir. 2006) (citing Camara, 378 F.3d at 372).

B.

Here, the IJ rejected Djondo's claims because, to the extent that Djondo was relying on her own testimony, the testimony was not credible, and to the extent that Djondo was relying on other evidence, that evidence, in light of the antecedent adverse credibility finding, also was not sufficient to sustain her burden of proof. Djondo argues that we should

34

reverse the BIA's decision for several reasons, including an argument that the IJ committed legal error and/or clear factual error in making the  adverse credibility finding. The majority sustains the adverse credibility determination; I am persuaded to the contrary.

1.

"The testimony of the [asylum] applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). The REAL ID Act, which applies to all applications for asylum and withholding of removal filed after May 11, 2005, provides guidance to immigration judges in making credibility determinations:

> Credibility determination[:] <u>Considering the totality of the circumstances, and all relevant factors</u>, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor[.]

8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added).

35

We review credibility determinations to ensure they are supported by substantial evidence, just as we did prior to the passage of the REAL ID Act. Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004); see also Shrestha v. Holder, 590 F.3d 1034, 1 1042 (9th Cir. 2010) ("The REAL ID Act did not strip us of our ability to rely on the institutional tools that we have developed, such as the requirement that an agency provide specific and cogent reasons supporting an adverse credibility determination, to aid our review."). Moreover, agency findings of fact, including credibility determinations, "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also INS v. Elias-Zacarias, 502 U.S. 478, 481 & n. 1 (1992). "This deference is broad but not absolute: an IJ who rejects a witness's positive testimony because in his or her judgment it lacks credibility should offer a specific, cogent reason for his [or her] disbelief." Tewabe v. Gonzales, 446 F.3d 533, 538 (4th Cir. 2006) (alteration in original). Moreover, because the BIA affirmed the IJ's decision and added its own discussion of the bases for its decision, "the factual findings and reasoning contained in both decisions are subject to judicial review." Niang v. Gonzales, 492 F.3d 505, 511 n.8 (4th Cir. 2007); see also Gandarillas-Zambrana v. BIA, 44 F.3d 1251, 1255 (4th Cir. 1995).

2.

As explained above, the IJ found that Djondo was not credible based solely on the one-week inconsistency between, on the one hand, the date of the red-shirt march in her testimony, her sister's testimony, and one of the written statements; and, on the other hand, the date of the march contained in the State Department and Amnesty International reports. The IJ made no findings with respect to the demeanor, candor, or responsiveness of Djondo or Gnininvi.

Djondo argues that in relying on the one-week error to support the adverse credibility finding, the IJ violated the REAL ID Act (in two ways) as well as the general requirement that an adverse credibility finding be supported by substantial evidence and a "specific" and "cogent" explanation. First, Djondo argues that although the REAL ID Act does not require "an explicit discussion of each factor" listed in the Act, an IJ must "consider[] . . . all relevant factors, and not just the ones that support an adverse credibility determination." Pet. Br. at 42 (emphasis in original). This the IJ failed to do, she argues, because notwithstanding the IJ's and BIA's statements that they considered "the totality of the circumstances," J.A. 4, the IJ's opinion shows that she "relied solely on the one-week mistake" to find Djondo incredible, "without considering or balancing the many relevant positive factors identified in the

37

REAL ID Act." Pet. Br. at 34. Those "positive factors," she argues, are the following:

- "the inherent plausibility of the applicant's or witness's account" – nothing about Djondo's testimony that she participated in and was beaten after the red-shirt march was implausible, especially since the evidence of her membership in the CDPA and her leadership of its women's wing was uncontested;

- "consistency between the applicant's or witness's written and oral statements" – neither the IJ nor the BIA (nor the Attorney General on appeal) has identified any such inconsistency;

- "internal consistency of each such statement" – all the statements are internally consistent; and

- "the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions)" – all of Djondo's evidence, including her testimony, was almost entirely consistent with the country reports; the only inconsistency was as to the date.

Id. at 44–45. "Consideration of all the relevant statutory factors," she argues, "compels a finding that [her] testimony and supporting evidence was credible." Id. at 46.

Second, Djondo argues, even if the IJ could limit the basis for the adverse credibility finding to the one-week mistake, or if we are assured that the IJ did "consider" all the positive "factors," the IJ and BIA still violated the REAL ID Act because they failed to explain why the one-week mistake was material -- i.e., why the error was "relevant" to the question of whether Djondo had failed to credibly show that she had suffered (and would be likely to suffer) persecution. See Pet. Br. 48-50.

For the same reasons, apart from any requirements imposed by the REAL ID Act, Djondo argues the IJ and BIA also violated the separate, preexisting requirements that (1) an adverse credibility determination be "supported by substantial evidence, . . . i.e., evidence that is 'reasonable, substantial, and probative . . . on the record considered as a whole,'" Dankam, 495 F.3d at 120 (quoting Elias-Zacarias, 502 U.S. at 481), and (2) that the IJ and BIA offer "specific, cogent reason[s]" for an adverse credibility determination. Id. at 120-21 (quoting Figeroa v. INS, 886 F.2d 76, 78 (4th Cir. 1989) (alteration in original)). Pet. Br. 46. As we explained in a pre-REAL ID Act case, an IJ must "demonstrate that he or she reviewed the record and balanced the relevant factors and must discuss the positive or adverse factors that support his or her decision." Zuh v.

<u>Mukasey</u>, 547 F.3d 504, 509 (4th Cir. 2008) (emphasis in original).[11]

Here, Djondo argues, the one-week inconsistency between her evidence and the country reports neither was substantial evidence nor constituted a cogent reason for finding that Djondo's testimony of persecution could not be believed. As Djondo explains:

> [T]he Board provided <u>no</u> reasons, much less cogent reasons, for concluding that the one week mistake in dates affected the credibility not only of Ms. Djondo and Ms. Gnininvi, but also of the six persons who submitted corroborating statements, five of whom did not mention the exact date of the demonstration. Unlike <u>Dankam</u> and <u>Camara</u>, in this case the Board did not attach any particular significance to the incorrect date, and it did not give any explanation as to why the mistake was significant. Nor is there any evidence in the record, much less substantial evidence, explaining why any significance can be attached to Ms. Djondo's mistaken testimony that the demonstration took place on February 20 instead of February 27 . . . .
>
> The Board's implicit, but unstated, conclusion is that Ms. Djondo, Ms. Gnininvi, and the six persons submitting written statements in support of Ms. Djondo were all lying when they stated that Ms. Djondo participated in the red-shirt demonstration and was beaten up by government militia members afterwards. Similarly, the Board must have concluded that the detailed descriptions of Ms. Djondo's past political activities, the red-shirt demonstration, and the Togolese militia's continued search for Ms. Djondo after the demonstration are all fabricated.

---

[11] Although <u>Zuh</u> was issued after 2005, the Act did not apply to the petitioner's claim because his application for asylum was filed before May 11, 2005. <u>See</u> <u>Zuh</u>, 547 F.3d at 505.

40

Such a conclusion, however, simply does not follow from the fact that Ms. Djondo and Ms. Gnininvi were mistaken by one week as to the date of the demonstration. Instead, the Board's (and the Immigration Judge's) conclusion is based on nothing more than speculation.

Pet. Br. at 48-49.

The Attorney General argues that the IJ and BIA did not violate any of these requirements, contending that,

[d]espite the importance to her case of Petitioner's purported beating after the red shirt rally – the only incident in which she claimed she was injured in Togo – Petitioner failed to accurately state a key fact about the rally – the date on which it took place. She failed to provide an accurate narrative of the event, which country conditions reports reveal occurred on February 27, 2005. . . . . The fact that Petitioner testified in a manner inconsistent with the country conditions documents, which she proffered in support of her claim, constituted a specific, cogent reason for the agency to disbelieve her claim.
. . .
[Moreover,] [t]he agency did not err when rejecting as unpersuasive Petitioner's explanation that she simply forgot the date, given that the "February 20, 2005" date was repeated fifteen times during the merits hearing, appeared in multiple corroborative documents, and was reiterated by both testifying witnesses. . . . Her argument fails to explain how three different individuals [Djondo, Gninvini, and Semeho Komla Edoh] each separately forgot the date, and coincidentally mis-remembered the event as having occurred on February 20.

Gov't Br. at 25-27 (citations to record omitted).

The Attorney General also seeks to buttress the BIA's decision by providing an explanation for why the one-week difference might be significant. As stated, the State Department

41

and Amnesty International reports describe a red-shirt march on February 27; Djondo, Gninvini and Edoh described the march they participated in as having occurred on February 20. Djondo and Gninvini also testified (albeit somewhat ambiguously) and Djondo's husband stated (very ambiguously) that the purpose of the march was to call for the resignation of Faure, the former dictator's son.[12] By the time the red-shirt march documented by Amnesty International and the State Department took place on February 27, Faure had already ceded power to Abass Bonfoh, the first vice-president of the National Assembly. J.A. 724. The Attorney General argues that this fact further supports the IJ's adverse credibility determination because "in order for the agency to accept Petitioner's explanation she had known the march took place 'in the 20's' and had merely confused the February 20 date for February 27, the agency would also have to discount volumes of proffered evidence and testimony claiming the protesters at the red shirt rally were demanding

_____

[12] See J.A. 564 (Gninvini describing the march as "people trying to call for a march . . . so he can step down"); 590 (Djondo describing the purpose of the march as "requesting the, the reinstallation of the constitution, that Eyadema's son cannot become just the president"); 623 (Djondo describing in her affidavit that the "women of the opposition organized a march to ask the son of late EYADEMA to step down and put Mr. NATCHABA in the presidency"); 653 (statement of Agbemehe Akoétey Kossi, Djondo's husband, that Djondo had "challenged the regime by taking part to the march against Faure GNASSINGBE").

[Gnassingbé's] resignation." Gov't Br. at 29-30 (citing J.A. 564, 590, 623, 653).

3.

As best as I can discern, the IJ and BIA based the adverse credibility determination on the following reasoning: Djondo and her corroborating evidence discloses that she participated in a red-shirt march on February 20, 2005, and was beaten on that day; the only red-shirt march mentioned in the country reports took place on February 27, 2005; therefore, she has not proven past persecution. Based on the record here, I am persuaded that this reasoning was inadequate and fatally lacks cogency.

There are, essentially, three possible interpretations of Djondo's evidence that might have <u>supported</u> the IJ's decision. First, the IJ might have believed Djondo that she participated in the February 27 march (the one described by the State Department and Amnesty International), and even that she was beaten, but disbelieved Djondo's testimony that she was beaten because of her political views and/or that she fears she would be persecuted if she were to return to Togo. Second, the IJ might have believed Djondo that she participated in a march sometime in February 2005, but disbelieved Djondo's testimony that she was beaten, or beaten because of her political views, because of the date inconsistency between her evidence and the country reports. Third, the IJ might have disbelieved Djondo

43

entirely, concluding that she had not proven that she participated in any political rally in February 2005.

Conversely, there are at least two possible interpretations of Djondo's explanation for the inconsistency. As stated, Djondo's explanation was that "maybe I can't remember exactly the date" but she knew that she "took part in the one requesting the demonstrators to wear red shirts." J.A. 604-05. First, this could mean that she did participate in the February 27, 2005, march, but failed (consistently) to recall the precise date of the march. Second, her explanation could mean that there were two red-shirt rallies in February 2005, one prior to February 25 (the date Faure stepped down) and one after. This is a perfectly plausible interpretation: the Amnesty International and State Department reports might not have been 100 percent comprehensive in listing the dates on which opposition parties held rallies. Interpreting the evidence this way would completely undercut the basis for the IJ's adverse credibility finding (and the BIA's affirmance thereof). It would also undercut the government's post-hoc explanation that Djondo's supposed one-week error was significant because Faure stepped down prior to the February 27 march; if she was beaten on February 20, as she testified, then she also would not have been lying that the purpose of the march was to urge Faure to step down.

44

As this discussion illustrates, the IJ and BIA failed to provide a cogent explanation for why they were discrediting Djondo's evidence. From the fact that the date in Djondo's and Gninivini's testimony was inconsistent with the date in the country reports, it does not necessarily follow that Djondo's credibility was undermined at all, let alone in a way fatal to her claim of past political persecution. Moreover, the IJ did not make any findings other than the one-week discrepancy that might have supported the adverse credibility determination.

Finally, the Attorney General's post-hoc theory that the one-week error was significant because Faure stepped down on February 25 does not buttress the IJ's conclusion, for two reasons. First, we cannot affirm an agency's determination on a ground the agency did not itself articulate. Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 539 (1981). Second, even if there was no red-shirt march on February 20, 2005, Djondo's testimony was far from clear that the march she claimed to have participated in occurred before Faure ceded power on February 25. As the State Department report explains, Abass Bonfoh, who took over on February 25, was only an interim President, a figurehead or placeholder. See supra n. 2. Faure remained the "leader of the ruling party" and was "a candidate in the announced presidential elections" to succeed Bonfoh. Id. "Real power apparently was retained by Faure Gnassingbe as he

45

continued to use the offices of the President while the interim President operated from the National Assembly." Id. Accordingly, a primary purpose of the February 27, 2005, protest might very well have been to oppose the future re-ascension of Faure to power. The record before us compels the conclusion that the IJ and the BIA must address these perfectly plausible inferences before summarily discrediting the claims here.

## III.

For these reasons, in my view, the lack of a cogent explanation for the adverse credibility finding requires that we vacate the BIA's order and remand for further proceedings. Accordingly, I respectfully dissent.